# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 2, 2021

Lyle W. Cayce
Clerk

No. 20-50448

TONY K. MCDONALD; JOSHUA B. HAMMER; MARK S. PULLIAM,

*Plaintiffs—Appellants*,

*versus*

JOE K. LONGLEY, *Immediate Past President of the State Bar of Texas*;
RANDALL O. SORRELS, *President of the State Bar of Texas*;
LAURA GIBSON,
*Member of the State Bar Board of Directors and Chair of the Board*;
JERRY C. ALEXANDER, *Member of the State Bar Board of Directors*;
ALISON W. COLVIN, *Member of the State Bar Board of Directors*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
No. 1:19-CV-219

Before SMITH, WILLETT, and DUNCAN, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Three Texas attorneys sued officers and directors of the State Bar of Texas under 42 U.S.C. § 1983. They allege that the Bar is engaged in political and ideological activities that are not germane to its interests in regulating the legal profession and improving the quality of legal services and that therefore,

compelling them to join the Bar and subsidize those activities violates their First Amendment rights. We vacate in part, render in part, and remand.

I.

A.

State bar associations are of two types: (1) "mandatory" and (2) "voluntary." Mandatory bars, also known as "integrated" bars, require that attorneys join and pay compulsory dues "as a condition of practicing law in a State." *Keller v. State Bar of Cal.*, 496 U.S. 1, 5 (1990). Voluntary bars do not. *See Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720, 1720 (2020) (Thomas, J., dissenting from denial of certiorari). Thirty-one states and the District of Columbia have mandatory bars, while most of the others have voluntary bars.[1]

The State Bar of Texas is mandatory. *See* Tex. Gov't Code § 81.051(b). All licensed Texas attorneys, more than 120,000 as of May 2019, must join the Bar, which "is a public corporation and an administrative agency" controlled by the Supreme Court of Texas. *Id.* § 81.011(a), (c). The Bar serves the following statutorily enumerated purposes:

(1) to aid the courts in carrying on and improving the administration of justice;

(2) to advance the quality of legal services to the public and to foster the role of the legal profession in serving the public;

(3) to foster and maintain on the part of those engaged in

---

[1] *See* Ralph H. Brock, *"An Aliquot Portion of Their Dues:" A Survey of Unified Bar Compliance with* Hudson *and* Keller, 1 Tex. Tech J. Tex. Admin. L. 23, 24 (2000); Leslie C. Levin, *The End of Mandatory State Bars*, 109 Geo. L.J. Online 1, 2 (2020). Most states have either a mandatory or voluntary bar, but California has switched to a hybrid model in which core functions are performed by a mandatory state bar, while other functions previously performed by its "sections" are now done by a separate voluntary bar association. Cal. Bus. & Pro. Code §§ 6001, 6031.5(a), 6056.

No. 20-50448

the practice of law high ideals and integrity, learning, competence in public service, and high standards of conduct;

(4) to provide proper professional services to the members of the state bar;

(5) to encourage the formation of and activities of local bar associations;

(6) to provide forums for the discussion of subjects pertaining to the practice of law, the science of jurisprudence and law reform, and the relationship of the state bar to the public; and

(7) to publish information relating to the subjects listed in Subdivision (6).

*Id.* § 81.012.

In addition to being required to join the Bar, Texas attorneys are mandated to pay membership fees.[2] The Bar, which is entirely self-funded, relies on membership fees for nearly half of its budget.[3] The Supreme Court of Texas, in collaboration with the Bar, sets the membership fee schedule. *See id.* § 81.054(a). The current annual dues for active attorneys range from $68 to $235, depending on how many years the attorney has been licensed. Those on inactive status pay $50.

Texas law does not give the Bar carte blanche to spend the membership fees however it pleases. The dues may "be used only for administering the public purposes" outlined above. *Id.* § 81.054(d). The State Bar Act forbids the Bar from using funds to "influenc[e] the passage or defeat of any legislative measure unless the measure relates to the regulation of the legal

---

[2] Except for emeritus members. *Id.* § 81.054(b)

[3] For the fiscal year ending in May 2018, those fees generated $23 million out of the Bar's approximately $51 million in revenue. The second most significant source of revenue is from sales of continuing legal education ("CLE") programs.

No. 20-50448

profession, improving the quality of legal services, or the administration of justice." *Id.* § 81.034. And the Bar's Policy Manual recognizes that "[t]he expenditure of funds by the State Bar of Texas is limited . . . as set forth . . . in *Keller*,"[4] a case that we discuss at length *infra*.

In addition to their required membership in the general Bar Association, Texas attorneys have the option to join a number of subject-matter "sections" that the Bar maintains. Those sections are funded in part by dues paid by attorneys who voluntarily join them[5] and in part by money allocated from the Bar's general fund.[6]

Finally, on top of the membership fees, Texas imposes a $65 "legal services fee" on certain attorneys.[7] Those funds are collected by the Supreme Court of Texas and remitted to the Comptroller. *Id.* § 81.054(c). They are allocated to pay for legal services for the indigent—half for civil services and half for criminal defense. *Id.*

---

[4] *State Bar of Texas Board of Directors Policy Manual*, STATE BAR OF TEXAS § 3.14.01 (2018), https://www.texasbar.com/AM/Template.cfm?Section=Governing _Documents1&Template=/CM/ContentDisplay.cfm&ContentID=42429 [hereinafter *Policy Manual*].

[5] *See Sections*, STATE BAR OF TEXAS (last visited Apr. 21, 2021), https://www.texasbar.com/Content/NavigationMenu/AboutUs/SectionsandDivisions/ SectionsandDivisions1/

[6] *See* STATE BAR OF TEXAS, *2019-2020 Proposed Combined Budget* 2, https://www.texasbar.com/AM/Template.cfm?Section=Meeting_Agendas_and_Minut es&Template=/CM/ContentDisplay.cfm&ContentID=43829 (allocating funds from the general fund to sections and volunteer committees).

[7] TEX. GOV'T CODE § 81.054(j). Exempt from the legal services fee are (1) inactive and nonpracticing attorneys, (2) attorneys over seventy years old, (3) those who work for the federal, state, or local governments, (4) § 501(c)(3) employees, and (5) out-of-state lawyers who do not practice in Texas. *Id.* § 81.054(k).

No. 20-50448

## B.

In carrying out its statutorily enumerated purposes, the Bar undertakes a plethora of initiatives. The plaintiffs object to a number of them, alleging that they are "political and ideological activities that extend far beyond any regulatory functions." We outline the objected-to activities here.

## 1.

The Bar has a legislative program, through which it lobbies for "bills drafted by sections of the State Bar." The Bar's Policy Manual forbids the Bar from taking a position on proposed legislation unless strict criteria are met. *See Policy Manual* § 8.01.03. Among those criteria are that the proposed legislation (1) "falls within the purposes, expressed or implied, of the State Bar as provided in the State Bar Act," (2) "does not carry the potential of deep philosophical or emotional division among a substantial segment of the membership of the bar," (3) "is in the public interest," and (4) "cannot be construed to advocate political or ideological positions." *Policy Manual* § 8.01.03(A), (C)–(D), (G).

In 2019, the Bar lobbied for forty-seven bills, on subjects ranging from LGBT rights to trusts and estates, that it supposedly determined to have met those criteria. Those measures included efforts to, among other things, (1) amend the Texas Constitution's definition of marriage (SJR 9); (2) create civil unions "as an alternative to marriage" (HB 978); (3) alter the procedures grandparents must use to obtain access to their grandchildren over parental objections (HB 575); (4) substantively amend Texas trust law (HB 2782); and (5) impose new notification requirements on parents who wish to take summer weekend possession of a child under a court order (HB 553).

The voluntary sections, as distinguished from the Bar as a whole, write and lobby for the bills included in the legislative program. But the Bar, using

No. 20-50448

mandatory dues, supports those efforts in a number of ways.  First, the legis-lative program must be approved by the Bar's board, placing the entire Bar's imprimatur on it.  Second, the voluntary sections are funded in part by the Bar's general fund.  And third, the Bar funds a Government Relations Department ("GRD"), which "manages and coordinates the State Bar's legislative program."[8]

2.

The record reflects that the Bar houses an Office of Minority Affairs ("OMA"), whose goals include "serv[ing] minority, women, and LGBT attorneys and legal organizations in Texas" and "enhanc[ing] employment and economic opportunities . . . in the legal profession" for members of those groups.  OMA sponsors "ongoing forums, projects, programs, and publications"—called "Minority Initiatives"—"dedicated to [its] diversity efforts."  Though the programming is focused on furthering diversity relative to certain groups, all Texas attorneys are encouraged to participate.  All told, the Bar spends about $500,000 per year on minority affairs.

3.

The Bar engages in, or financially supports, numerous activities aimed at making legal services available to the needy.  First, it spends more than $1 million annually to support its Legal Access Division ("LAD"), which facilitates *pro bono* efforts in a wide variety of activities in the legal arena, including immigration, veterans' affairs, and landlord-tenant disputes.  It

---

[8] *Governmental Relations*, STATE BAR OF TEXAS (Apr. 21, 2021), https://www.texasbar.com/Content/NavigationMenu/AboutUs/GovernmentalRelations/default.htm.  The GRD also "serves as the State Bar's liaison to the Texas Legislature and other state and federal governmental entities."  *Id.*  In that capacity, it responds to requests for information and assistance by the Texas Legislature and other entities, and reviews thousands of bills each legislative session.

No. 20-50448

"offers support, training, publications, resource materials, and more to legal services programs and *pro bono* volunteers."

Second, in support of its *pro bono* efforts, the Bar maintains a directory of "volunteer and resource opportunities."[9] The webpage appears to direct lawyers to various resources depending on the Bar's perceived needs of the time. For example, as of April 2021, it directed lawyers to volunteering for legal needs related to the COVID-19 pandemic (e.g. evictions, unemployment, and domestic problems). For a time in 2019, it directed lawyers to organizations representing asylum-seekers and illegal aliens.

Third, the Bar funds the Texas Supreme Court's Access to Justice Commission ("AJC"), which "focuses on cutting-edge initiatives and pilot projects that promote access to justice in Texas." Among other things, it aims to "increase resources and funding for access to justice," "develop and implement initiatives designed to expand civil access to justice," and promote "systemic change." One of its mechanisms for achieving those aims is lobbying for "both funding and non-funding legislation."

Finally, as mentioned above, the legal services fee, by statute, is used to fund legal services for the indigent.

4.

The Bar also undertakes a number of miscellaneous activities to which the plaintiffs object. It hosts an annual convention, which sponsors panels, some of which the plaintiffs contend are ideologically charged. The Bar funds continuing legal education ("CLE") programs, some of which the plaintiffs

---

[9] *Volunteer and Resource Opportunities*, STATE BAR OF TEXAS, https://www.texasbar.com/Content/NavigationMenu/LawyersGivingBack/Volunteer/default.htm.

aver are similarly charged.  And the Bar funds the *Texas Bar Journal*.

## C.

Recognizing that some members might object to various of its myriad initiatives, the Bar provides ways for dissenting members to make their disagreements known.  Before the expenditure is approved, members can lodge their objections to either the Bar's Board of Directors or the appropriate committee or section.  *See, e.g.*, *Policy Manual* §§ 8.01.03(B), 8.01.06(B), 8.01.08(B), 8.01.09(D).  Members may also express disapproval at the Bar's annual public hearing on its proposed budget.  Tex. Gov't Code § 81.022(b)–(c).  The ballot box provides another incidental check:  Members vote for the Bar's officers and directors. *See generally Policy Manual* §§ 1.03, 2.01.

The Bar also provides a mechanism for objecting members to obtain a *pro rata* refund of their membership fee.  Specifically, members may file a written objection "to a proposed or actual expenditure . . . as not within the purposes or limitations" set forth by the State Bar Act or by Supreme Court precedent.  *Policy Manual* §§ 3.14.01, 3.14.02.  The protesting member may "seek refund of a *pro rata* portion of his or her dues expended, plus interest," on the objectionable activity.  *Id.* § 3.14.02.  The Bar does not proactively furnish members with a breakdown of their respective *pro rata* shares of funding the Bar's chosen pursuits.  Objections are reviewed by the Executive Director, who "in consultation with the President, shall have the discretion to resolve" it.  *Id.* § 3.14.03.  A refund is the *only* available remedy—an objector cannot prevent the Bar from otherwise pursuing the objected-to activity.  If a refund is issued, it is done so only "for the convenience of the Bar":  It does not constitute an admission that the expense was improper.  *Id.* § 3.14.04.  If a refund is denied, the objector has no further administrative recourse.

The Bar requires notice of those procedures to be "published in conjunction with any publication or description of the State Bar's budget, legislative program, performance measures, amicus briefs, and any other similar policy positions adopted by the State Bar." *Id.* § 3.14.05. Nevertheless, the Bar has record of only one member—who is not among the plaintiffs and who lodged the objection after the plaintiffs filed this lawsuit—using the procedure since its adoption in 2005.

## D.

The plaintiffs sued under 42 U.S.C. §§ 1983 and 1988 on three theories: (1) Compelling the plaintiffs "to join, associate with, and financially support the State Bar as a precondition to engaging in their chosen profession" violates their "rights to free speech and association"; (2) in the alternative, if they can be compelled to join, requiring them to "subsidize political and ideological activities that extend beyond the Bar's core regulatory functions" violates their right to free speech; and (3) related to both of those, "[t]he Bar's procedures for separating chargeable and non-chargeable expenses are inadequate to protect" their First Amendment rights. The plaintiffs moved for a preliminary injunction and partial summary judgment on liability.[10]

The Bar cross-moved for summary judgment.[11] It countered with

---

[10] The plaintiffs moved only for partial summary judgment because the scope of relief they planned to seek differed based on the district court's holding on liability. We address both the summary judgment on liability and the scope of the relief plaintiffs are entitled to through a preliminary injunction; we do not have occasion to opine on the full scope of relief to which they may be entitled.

[11] The Bar also filed a motion to dismiss, asserting that the original named defendants did not enforce the mandatory bar membership and legal services fee. In response, the plaintiffs filed an amended complaint adding additional defendants to address those concerns. The district court dismissed the Bar's motion without prejudice, and the Bar

three principal points.  First, it contended that Supreme Court precedent—specifically *Keller* and *Lathrop v. Donohue*, 367 U.S. 820 (1961) (plurality)—forecloses the plaintiffs' claim that being compelled to join the bar violates the First Amendment.  Second, the Bar asserted that the challenged expenditures are constitutionally permissible as "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of . . . legal service[s]."  And third, the Bar maintained that its refund procedures are constitutionally adequate.

The district court denied the plaintiffs' motions and granted summary judgment to the Bar.  The court held that *Lathrop* and *Keller* remain binding in spite of *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), and that *Lathrop* and *Keller* foreclose the plaintiffs' contention that being forced to join the bar violates the First Amendment.  The court further determined that all of the challenged Bar expenses passed constitutional muster under *Keller*, "because they further[ed] Texas's interest in professional regulation or legal-service quality improvement."  Finally, the court rejected the plaintiffs' challenge to the refund procedures, concluding that they are constitutionally adequate.  The court entered a "take nothing" judgment, and the plaintiffs appeal.

## II.

Because "[t]his court has a continuing obligation to assure itself of its own jurisdiction"[12] before addressing the merits, we must determine whether the Tax Injunction Act ("TIA") stripped the district court of jurisdiction.  Our review is *de novo*.  *Washington v. Linebarger, Goggan, Blair, Pena & Samp-*

---

does not challenge the propriety of that dismissal on appeal.

[12] *United States v. Pedroza-Rocha*, 933 F.3d 490, 493 (5th Cir. 2019) (per curiam), *cert. denied*, 140 S. Ct. 2769 (2020).

*son, LLP*, 338 F.3d 442, 444 (5th Cir. 2003).

The TIA provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.[13] In other words, "the [TIA] is a broad jurisdictional impediment to federal court interference with the administration of state tax systems." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quotation marks omitted). The TIA does not, however, impede federal courts' review of regulatory fees. *See id.* Therefore, to determine our jurisdiction, we must decide whether the membership fee and the legal services fee are taxes or, instead, whether they are fees.

"Whether a charge is a fee or a tax is a question of federal law." *Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000). Although the label given to a particular outlay "has no bearing on the resolution of the question," *Home Builders*, 143 F.3d at 1010 n.10, we may take notice of how an expense is treated by the state's courts, *see Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 500 n.13 (5th Cir. 2001). Generally, "a broad construction of 'tax' is necessary to honor Congress's goals in promulgating the TIA." *Henderson v. Stalder*, 407 F.3d 351, 356 (5th Cir. 2005).

"[T]he line between a 'tax' and a 'fee' can be a blurry one." *Home Builders*, 143 F.3d at 1011 (quotation marks omitted). Indeed, "the distinction between a tax and a fee is a spectrum with the paradigmatic fee at one end and the paradigmatic tax at the other." *Washington*, 338 F.3d at 444 (quotation marks omitted). But we have enunciated some workable distinc-

---

[13] Similarly, "[t]he Anti-Injunction Act, 26 U.S.C. § 7421(a), bars any 'suit for the purposes of restraining the assessment or collection of any tax.'" *CIC Servs., LLC, v. IRS*, 141 S. Ct. 1582, 1586 (2021).

tions. First, "the classic tax sustains the essential flow of revenue to the government, while the classic fee is linked to some regulatory scheme." *Home Builders*, 143 F.3d at 1011. Second, "[t]he classic tax is imposed by a state or municipal legislature, while the classic fee is imposed by an agency upon those it regulates." *Id.* And third, "[t]he classic tax is designed to provide a benefit for the entire community, while the classic fee is designed to raise money to help defray an agency's regulatory expenses." *Id.*

The membership fees are "classic fees." First, they are linked to the regulation of the legal profession, not to generating revenue for the government. Texas law requires that Bar funds "be used only for administering the public purposes provided by" the State Bar Act. TEX. GOV'T CODE § 81.054(d). In fact, the Supreme Court of Texas must distribute the fees to the Bar *only* for funding expenditures to pursue those ends. *See id.* § 81.054(c). Second, the membership fees are imposed neither by a legislature nor on the entire community. Although a statute authorizes charging the fees, the process of setting and collecting those fees is left to the Texas Supreme Court and the Bar. *See id.* §§ 81.022, 81.054(a), (c). Furthermore, the dues are paid only by those regulated by the Bar—licensed Texas attorneys—"not the public at large," indicating they are a fee. *Neinast*, 217 F.3d at 278. Third and finally, the membership fees defray the Bar's costs. The Bar is entirely self-funded, and the mandatory dues amount to nearly half of its annual revenue.

The legal services fee is also a fee, albeit a less paradigmatic one. Like the membership fee, the legal services fee is imposed only on the legal profession, "not the public at large." *Id.* And the fee is linked to the regulation of the legal profession, given that its purpose is to ensure adequate funding of "basic civil legal services to the indigent and legal representation and other defense services to indigent defendants in criminal cases." TEX. GOV'T CODE § 81.054(d). In other words, its purpose is not to raise revenue but to

No. 20-50448

ensure that members of the legal profession are able to provide a particular legal service. On the other hand, unlike the membership fee, the legal services fee is imposed directly by the legislature. *Compare id.* § 81.054(a), *with id.* § 81.054(j). But that does not outweigh the other factors.

Since neither the membership fee nor the legal services fee is a tax, the TIA does not deprive the federal courts of jurisdiction. We therefore turn to the merits.

## III.

We first analyze the plaintiffs' claim that compelling them to join the Bar violates the First Amendment. The Supreme Court has twice opined on whether mandatory bars violate the First Amendment. We discuss those cases, *Lathrop v. Donohue*, 367 U.S. 820 (1961) (plurality), and *Keller v. State Bar of California*, 496 U.S. 1 (1990), to determine whether the plaintiffs' claim survives.[14]

---

[14] Since *Lathrop* and *Keller* were decided, the Supreme Court's First Amendment caselaw has changed dramatically. Both cases drew from the then-existing jurisprudence on the First Amendment implications of mandatory union dues, but that jurisprudence has evolved. *Keller*, in particular, rested almost exclusively on *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), which the Court overruled in *Janus*, 138 S. Ct. at 2486. Those changes, and *Janus* in particular, cast doubt on *Lathrop* and *Keller*. *See Jarchow*, 140 S. Ct. at 1720 (Thomas, J., dissenting from denial of certiorari). *Contra Janus*, 138 S. Ct. at 2498 (Kagan, J., dissenting) (contending that *Janus* did not call *Keller* into question).

But "the Supreme Court abrogates its cases with a bang, not a whimper, and it has never revisited" either *Lathrop* or *Keller*. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 405 (5th Cir. 2020). So, despite their "increasingly wobbly, moth-eaten foundations," *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (cleaned up), *Lathrop* and *Keller* remain binding. Because they have "direct application in [this] case," we apply them, "leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). With that said, *Lathrop*'s and *Keller*'s weakened foundations counsel against expanding their reach as we consider questions they left open.

In *Lathrop*, 367 U.S. at 827–28, the Court considered whether mandatory bar membership necessarily violates the right to freedom of association. The Wisconsin Bar, the *Lathrop* plaintiff alleged, "express[es] . . . opinion[s] on legislative matters" and "utilizes its property, funds and employees for the purposes of influencing legislation and public opinion toward legislation." *Id.* at 827. Therefore, he contended "that he [could not] constitutionally be compelled to join and give support to" the Bar. *Id.*

The Court rejected the plaintiff's claim for two reasons. First, it noted that the plaintiff's "compulsory enrollment imposes only the duty to pay dues"; his involuntary membership did not require any other participation. *Id.* at 827–28. Second, the Court found that the bar's activities at issue were almost entirely limited to "elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State" *Id.* at 843. Though that bar was engaged in legislative activity, that activity was "not the major activity of the State Bar," *id.* at 839, and, furthermore, it was limited to bills pertinent to the legal profession for which there was "substantial unanimity," *id.* at 834–38.

After deciding that compelling the plaintiff to pay dues to such a bar association did not violate the freedom of *association*, the *Lathrop* Court, noting the paucity of the record, declined to decide whether "the use of his money for causes which he opposes" violated his right to *free speech*. *Id.* at 845. Three decades later, *Keller* reached that issue.

Like the *Lathrop* plaintiff, the *Keller* plaintiffs claimed that compelling their financial support of political activities violated their rights to freedom of speech and freedom of association. *Keller*, 496 U.S. at 5–6. The Court held that state bar associations may constitutionally charge mandatory dues to "fund activities germane" to "the purpose[s] for which compelled association was justified," i.e., "regulating the legal profession and improving the

quality of legal services." *Id.* at 13–14. But state bar associations cannot constitutionally use mandatory dues to "fund activities of an ideological nature which fall outside of those areas of activity." *Id.* at 14. Although it held that at least some complained-of activities were germane, the Court remanded for the lower courts to determine exactly which of the challenged activities were non-germane.[15]

After deciding the free speech issue, the Court turned briefly to freedom of association. The *Keller* plaintiffs contended that "they cannot be compelled to associate with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop* and *Abood* [*v. Detroit Board of Education*, 431 U.S. 209 (1977)]." *Id.* Despite noting that the plaintiffs' claim "appears to implicate a much broader freedom of association claim than was at issue in *Lathrop*," *id.* at 17, the Court did not resolve that broader claim, *see id.*

So where do *Lathrop* and *Keller* leave us? *Lathrop* held that lawyers may constitutionally be mandated to join a bar association that solely regulates the legal profession and improves the quality of legal services. *Keller* identified that *Lathrop* did not decide whether lawyers may be constitutionally mandated to join a bar association that engages in other, non-germane activities. Nor did *Keller* resolve that question.[16] Therefore, we

---

[15] *See Keller*, 496 U.S. at 15–16 (noting that "[c]ompulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative," both of which the plaintiffs asserted the state bar did).

[16] We join the Ninth and Tenth Circuits in reading *Lathrop* and *Keller* as leaving that question unresolved. *See Schell v. The Chief Justice & Justices of the Oklahoma Supreme Court*, No. 20-6044, 2021 WL 2657106, at *11 (10th Cir. June 29, 2021); *Crowe v. Or. State Bar*, 989 F.3d 714, 727–29 (9th Cir. 2021), *petition for cert. filed* (May 27, 2021) (No. 20-1678)."

must both decide that issue and determine whether the Texas Bar is engaged in non-germane activities.

## A.

To determine whether compelling the plaintiffs to join a bar that engages in non-germane activities violates their freedom of association, we must decide (1) whether compelling the plaintiffs to join burdens their rights and, (2) if so, whether it is nevertheless justified by a sufficient state interest.

### 1.

"[F]reedom of association is never mentioned in the United States Constitution."[17]  Instead, it is implicit in the other rights listed in the First Amendment.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  As relevant here, "[a]n individual's freedom to speak . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."[18]  Because the right to freedom of association is part of the freedom of speech, "[t]o determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'"  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

For groups that engage in expressive association, the "[f]reedom of association . . . plainly presupposes a freedom not to associate."  *Roberts*, 468 U.S. at 623.  Those groups have a right to restrict their membership,

---

[17] Amy Gutmann, *Freedom of Association: An Introductory Essay*, *in* Freedom of Ass'n 3, 9 (Amy Guttman ed. 1998); *see* U.S. Const. amend. I.

[18] *Roberts*, 468 U.S. at 622; *see also NAACP v. Alabama* ex rel. *Patterson*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association . . . .").

because the membership is the message.[19]  Individuals have an analogous right to "eschew association for expressive purposes."  *Janus*, 138 S. Ct. at 2463.  That right is part and parcel of the "cardinal constitutional command" that the government may not compel "individuals to mouth support for views they find objectionable."  *Id.*[20]

Based on that, compelling a lawyer to join a bar association engaged in non-germane activities burdens his or her First Amendment right to freedom of association.  Such a bar association would invariably be engaged in expressive activities.  Even bar associations that engage in only germane activities undertake some expressive activities; for example, proposing an ethical rule expresses a view that the rule is a good one, and commenting on potential changes to the state's court system, as the bar in *Lathrop* did, expresses a view that such a reform is a good or bad idea.

Bar associations that also engage in non-germane activities will almost certainly be engaging in additional expressive activities that "support . . . a particular conception of the good life or controversial ideology of the good society."  *Id.*  And, when a bar association does so, part of its expressive message is that its members stand behind its expression.  The membership is part of the message.  Compelling membership, therefore, compels support of that message.  If a member disagrees with that "conception of the good life or controversial ideology," then compelling his or her membership infringes on

---

[19] *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 680 (2010) ("Who speaks . . . colors what concept is conveyed.").

[20] "When membership of an association requires the individual to give support to a particular conception of the good life or controversial ideology of the good society, the freedom to refuse association is clearly fundamental to the individual's freedom to live authentically in accordance with his/her own ethical and political beliefs."  Stuart White, *Trade Unionism in a Liberal State*, *in* Freedom of Ass'n, *supra*, at 330, 345.

No. 20-50448

the freedom of association. *Id.*

2.

But that does not necessarily mean the plaintiffs are entitled to relief. "The right to associate for expressive purposes is not . . . absolute." *Roberts*, 468 U.S. at 623. In its freedom-of-association cases, the Court has generally applied "exacting . . . scrutiny," under which "mandatory associations are permissible only when they serve a 'compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox v. Serv. Emps. Intl Union, Loc. 1000*, 567 U.S. 298, 310 (2012) (quoting *Roberts*, 468 U.S. at 623).

Compelled membership in a bar association that is engaged in only germane activities survives that scrutiny. We know that both because *Lathrop* held that compelled membership in such a bar did not violate freedom of association and because of the more recent statement in *Harris v. Quinn*, 573 U.S. 616, 655–56 (2014): States "have a strong interest in allocating to the members of the bar, rather than the general public, the expense of ensuring that attorneys adhere to ethical practices" as well as of regulating the legal protection and improving the quality of legal services. *Id.* And, for that reason, *Keller*, which allowed compelled subsidization[21] of germane activities, "fits comfortably within the [exacting scrutiny] framework." *Id.* at 655.

Compelled membership in a bar association that engages in non-germane activities, on the other hand, fails exacting scrutiny. *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 310 (2012) (quoting *Roberts*,

---

[21] Exacting scrutiny is applied to both freedom-of-association and compelled-subsidy claims. *See, e.g.*, *Janus*, 138 S. Ct. at 2465 (compelled subsidy); *Dale*, 530 U.S. at 648 (freedom of association).

468 U.S. at 623). Plaintiffs suggest that, instead of exacting scrutiny, strict scrutiny should apply. Under that standard, the government must show that its action is "narrowly tailored" to "further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (cleaned up). Because the bar's mandatory membership "cannot survive under even the more permissive standard," we do not decide whether strict scrutiny is necessary. *See Janus*, 138 S. Ct. at 2465. Although states have interests in allocating the expenses of regulating the legal profession and improving the quality of legal services to licensed attorneys, they do not have a compelling interest in having all licensed attorneys engage as a group in other, non-germane activities.

Moreover, there are other "means significantly less restrictive of associational freedoms" to achieve the state's legitimate interests. *Knox*, 567 U.S. at 310. Almost twenty states—including some of the largest legal markets, such as New York, Illinois, and Pennsylvania—directly regulate the licensing and disciplining of attorneys. *See* Brock, *supra*, at 24 n.1 (not listing those states as having mandatory bars).

The Bar cannot reasonably suggest that those states are unable to regulate their legal professions adequately. Nor does the Bar have to cede its ability to engage in non-germane activities entirely—as California has shown, a hybrid model is possible.

Therefore, the plaintiffs are entitled to summary judgment on their freedom-of-association claim if the Bar is in fact engaged in non-germane activities.

## B.

The purposes justifying compelled association in a bar association are "regulating the legal profession" and "improving the quality of legal services." *Keller*, 496 U.S. at 13. For activities to be germane, they must be

"necessarily or reasonably incurred for" those purposes. *Id.* at 14. The plaintiffs contend that all "activities of a 'political or ideological' nature" necessarily are non-germane. That misses the mark.

*Keller* said mandatory dues cannot be used to "fund activities of an ideological nature *which fall outside of those areas of activity*." *Id.* (emphasis added). Though later decisions have framed *Keller* somewhat as these plaintiffs do,[22] none of them purported to alter *Keller*'s standard, which contemplates that some political or ideological activities might be germane. With that in mind, we turn to "[t]he difficult question" of determining whether each respective challenged activity is germane. *Id.*

### 1.

The Bar's legislative program is neither entirely germane nor wholly non-germane. The plaintiffs advocate a bright line rule that *any* legislative lobbying is non-germane. But such a rule is foreclosed by *Lathrop* and *Keller*. In *Lathrop*, 367 U.S. at 836–37, the Court identified no First Amendment violation despite the Wisconsin bar's lobbying for various pieces of legislation regarding the state court system, attorney compensation, and other matters related to the legal profession. And *Keller*, 496 U.S. at 15, highlighted that lobbying is germane where "officials and members of the Bar are acting essentially as professional advisers to those ultimately charged with the regu-

---

[22] *See, e.g.*, *Harris*, 573 U.S. at 655 (describing *Keller* as holding "that members of this bar could not be required to pay the portion of bar dues used for political or ideological purposes but that they could be required to pay the portion of the dues used for activities connected with proposing ethical codes and disciplining bar members"); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 558 (2005) ("[W]e have invalidated the use of the compulsory fees to fund speech on political matters." (citing *Keller*)); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 231 (2000) ("[L]awyers could not, however, be required to fund the bar association's own political expression." (citing *Keller*, 496 U.S. at 16)).

No. 20-50448

lation of the legal profession." At the same time, the scope of the Bar's legislative program belies its contention that every single bill it has lobbied for is germane to regulating the legal profession or improving the quality of legal services.

*Keller* did not lay down a test to determine when lobbying is germane and when it is not, acknowledging that the dividing line would "not always be easy to discern." *Id.* at 16. Instead, it identified "advanc[ing] a gun control or nuclear weapons freeze initiative" and "proposing ethical codes" as the bookends of the spectrum and left it to lower courts to work out intermediate cases. We must do so now.

Except as stated below, advocating changes to a state's substantive law is non-germane to the purposes identified in *Keller*. Such lobbying has nothing to do with regulating the legal profession or improving the quality of legal services. Instead, those efforts are directed entirely at changing the law *governing* cases, disputes, or transactions *in which attorneys might be involved*. Lobbying for legislation regarding the functioning of the state's courts or legal system writ large, on the other hand, is germane. So too is advocating for laws governing the activities of lawyers *qua* lawyers.[23]

---

[23] *Lathrop*'s description of the topics on which the Wisconsin Bar took positions is illustrative of the type of lobbying that is germane:

> The State Bar, through its Board of Governors or Executive Committee, has taken a formal position with respect to a number of questions of legislative policy. These have included such subjects as an increase in the salaries of State Supreme Court justices; making attorneys notaries public; amending the Federal Career Compensation Act to apply to attorneys employed with the Armed Forces the same provisions for special pay and promotion available to members of other professions; improving pay scales of attorneys in state service; court reorganization; extending personal jurisdiction over nonresidents; allowing the recording of unwitnessed con-

21

No. 20-50448

Applied to the Bar's 2019 legislative program, for example, that means that some lobbying was germane, but most was not. Many of the bills the Bar supported relate to substantive Texas law and are wholly disconnected from the Texas court system or the law governing lawyers' activities. For example, the Bar's lobbying to amend the Texas Constitution's definition of marriage and create civil unions is obviously non-germane.[24] The Bar's presumably less-controversial proposed substantive changes to Texas family law are equally non-germane. The Bar's lobbying for the "creation of an exemption regarding the appointment of *pro bono* volunteers," on the other hand, is germane, because it relates to the law governing lawyers. Its lobbying for changes to Texas trust law is germane to the extent the changes affect lawyers' duties when serving as trustees, and non-germane to the extent the changes do not.

---

veyances; use of deceased partners' names in firm names; revision of the law governing federal tax liens; law clerks for State Supreme Court justices; curtesy and dower; securities transfers by fiduciaries; jurisdiction of county courts over the administration of inter vivos trusts; special appropriations for research for the State Legislative Council.

*Lathrop*, 367 U.S. at 836–37 (citations omitted). Those positions, with the possible exceptions of "curtesy and dower," "extending personal jurisdiction over nonresidents," and "federal tax liens," all relate to the state's court system or the activities of lawyers. That type of lobbying is germane.

In addition to its formally taken positions, the Wisconsin bar set up a group to address federal legislation affecting "the practice of law, or lawyers as a class, or the jurisdiction, procedure and practice of the Federal courts and other Federal tribunals, or creation of new Federal courts or judgeships affecting this state, and comparable subjects." *Id.* at 838. Announcing positions on those topics would also pass the germaneness test.

[24] The Bar contends that its lobbying was germane because "seeking to amend or repeal unconstitutional laws benefits the legal profession and improves the quality of legal services because it reduces the risk that lawyers, their clients, members of the public, or government officials will rely on laws that judicial decisions have rendered invalid." But *Keller* does not afford the Bar a roving commission to advocate for legislation to "amend or repeal unconstitutional laws" or "clean up legal texts."

No. 20-50448

What is important, however, is that *some* of the legislative program is non-germane. The Bar attempts to salvage the program by maintaining that only its voluntary sections engage in lobbying and that therefore plaintiffs are not compelled to associate with those initiatives. But, by the Bar's own admission, "[n]o voluntary section may assert a position regarding legislative, judicial, or executive action unless it has first obtained permission" from the Bar's Board of Directors. *See Policy Manual* § 8.01.06. Those positions have the imprimatur of the entire Bar.

Moreover, even if the subject-matter sections undertake the direct-lobbying expenses, the Bar still uses mandatory dues to fund those sections directly and to pay for the GRD, which reviews the sections' proposals. That too ties the entire Bar to the program. In sum, some of the legislative program is non-germane, so compelling the plaintiffs to join an association engaging in it violates their freedom of association.

2.

The Bar's various diversity initiatives through OMA, though highly ideologically charged, are germane to the purposes identified in *Keller*. The plaintiffs contend that OMA's diversity initiatives are "highly ideological," because they support the approach of "having programs targeted at certain individuals based on their race, gender, or sexual orientation" and "people of good faith . . . disagree sharply about the merits of such programs." The plaintiffs are certainly right on that point—affirmative action and other identity-based programs, in contexts ranging from contract bidding to higher education, have spawned sharply divided public debate and widespread, contentious litigation.[25] Legislation has been introduced in Congress to address

---

[25] *See, e.g., Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. by Any Means Necessary (BAMN)*, 572 U.S. 291 (2014); *Parents*

a number of race-based issues,[26] and litigation remains pending challenging several diversity-justified initiatives.[27]  In other words, that issue is a "sensitive political topic[ ]" that is "undoubtedly [a] matter[] of profound value and concern to the public."  *Janus*, 138 S. Ct. at 2476 (cleaned up).

But, despite the controversial and ideological nature of those diversity initiatives, they are germane to the purposes identified by *Keller*.  They are aimed at "creating a fair and equal legal profession for minority, women, and LGBT attorneys," which is a form of regulating the legal profession.  And the Bar contends that those initiatives "help to build and maintain the public's trust in the legal profession and the judicial process as a whole," which is an improvement in the quality of legal services.

The germaneness test does not require that there be unanimity on the Bar's position on what best regulates the legal profession—that is typically for the Bar to decide.[28]  To take a non-controversial example, the Bar's advocating a particular ethical rule is germane no matter how strenuously an attor-

---

*Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995).

[26] *See, e.g.*, Commission to Study and Develop Reparation Proposals for African-Americans Act, H.R. 40, 116th Cong. (2019); Commission to Study and Develop Reparation Proposals for African-Americans Act, S. 1083, 116th Cong. (2019); George Floyd Justice in Policing Act of 2020, H.R. 7120, 116th Cong. (2020).

[27] *See, e.g., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020), *petition for cert. filed* (Feb. 25, 2021) (No. 20-1199).

[28] But there are limits.  Certain ideologically charged activities might be so tenuously related to the legal profession that any argument they are germane would be pretextual.  In holding that the diversity initiatives are germane, we do not give the Bar *carte blanche* to engage in any ideological activities so long as they have some sophistic argument the activities are germane.  We just identify that the diversity initiatives are not so tenuously connected to the purposes identified in *Keller*, and that therefore their ideologically charged nature does not defeat their germaneness.

No. 20-50448

ney might disagree with its propriety. The same principle applies here. In sum, the diversity initiatives are "activities of an ideological nature which fall [in]side" the areas identified by *Keller*, 496 U.S. at 14. Given that those activities are germane under *Keller*, they are not a basis for granting summary judgment for the plaintiffs.[29]

3.

Most, but not quite all, of the Bar's activities aimed at aiding the needy are germane. Specifically, (1) the LAD, (2) the Bar's directory of volunteer and resource opportunities, and (3) the legal services fee solely support *pro bono* work. That is germane to both regulating the legal profession and improving the quality of legal services. Legal aid and *pro bono* programs focus on providing legal counsel to millions of Texans who cannot afford it and would otherwise be forced to proceed *pro se*. This improves the quality of legal services available to low-income Texans, given that they would otherwise have no legal services at all.

Such initiatives also aid Texas courts, because decreasing the number of *pro se* litigants reduces the administrative burdens those litigants place on Texas courts. Moreover, legal aid and *pro bono* efforts help lawyers to "fulfill [their] ethical responsibility to provide public interest legal service."[30] The Supreme Court has suggested that funding legal aid and encouraging *pro bono*

---

[29] We doubt it would be constitutionally permissible, under *Janus*, to compel the plaintiffs to join an association taking the Bar's stances on those ideologically charged issues. But *Keller* binds us as the caselaw that is most directly applicable.

[30] TEX. DISCIPLINARY R. PRO. CONDUCT 6.01 cmt. 5; *see also id.* preamble ¶ 6 ("A lawyer should render public interest legal service. . . . The provision of free legal services to those unable to pay reasonable fees is a moral obligation of each lawyer . . . ."); TEX. STATE BAR BD. OF DIRS., PRO BONO RESOLUTION (2000) ("[E]ach Texas attorney should aspire to render at least 50 hours of legal services to the poor each year . . . .").

No. 20-50448

service are permissible ends for a mandatory bar to pursue,[31] and our sister circuits appear to agree.[32]

The plaintiffs' main complaint with those programs seems to be that they disagree with the Bar's choice of legal aid organizations to support, particularly in the context of immigration. Specifically, they contend that facilitating representation of aliens "is *itself* a highly 'substantive' and 'ideological activity'" that "squarely aligns the Bar with one view of a politically charged national debate." But a "lawyer's representation of a client . . . does not constitute an endorsement of the client's political, economic, social or moral views or activities."[33] It follows that there is no reason to believe that facilitating lawyers' representation of aliens in navigating immigration laws constitutes an endorsement of any particular viewpoint about those statutes. And structurally, in cases where the federal government is a party, it is unsurprising that only one side of that "v" needs *pro bono* assistance.

In any event, LAD's directory merely provides information for attorneys interested in such matters to connect with related organizations, and LAD provides *pro bono* support for groups touching on a wide array of legal

---

[31] *See Lathrop*, 367 U.S. at 840–43 (observing most of the Wisconsin Bar's political activities, which included support for legal aid, "serve the function . . . of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State").

[32] *See, e.g.*, *Schneider v. Colegio de Abogados de P.R.*, 917 F.2d 620, 626, 631 (1st Cir. 1990) (endorsing mandatory dues to support "legal aid services"); *Levine v. Heffernan*, 864 F.2d 457, 462 & n.4 (7th Cir. 1988) (noting that *Lathrop* indicated that "helping [to] establish legal aid systems" was an "important activit[y] that the bar engaged in"); *Gibson v. Fla. Bar (Gibson I)*, 798 F.2d 1564, 1569 n.4 (11th Cir. 1986) ("Acceptable areas for Bar lobbying would include . . . budget appropriations for the judiciary and legal aid . . . .").

[33] TEX. DISCIPLINARY R. PRO. CONDUCT 6.01 cmt.4. If it did, no attorney would want to represent an accused murderer or child molester.

disciplines.[34]  The plaintiffs do not allege, and the record does not support, that LAD reserves those resources only for low-income Texans with certain political views or those who are pursuing certain ideological causes.

AJC is more complicated, because unlike LAD, the resources page, and the legal services fee, AJC's activities are not *entirely* cabined to making legal representation more available to low-income Texans.  To be sure, most of its activities are so directed,[35] and to the extent the Bar is supporting AJC activities limited to helping low-income Texans access legal services, it is germane.  But some of AJC's activities include lobbying for changes to Texas substantive law designed to benefit low-income Texans.[36]  Those may be salutary activities.  But they are aimed at making substantive Texas law more favorable to low-income Texans, not at "regulating the legal profession" or "improving the quality of legal services," so they are non-germane under *Keller*.  Therefore, the Bar's funding of the AJC is non-germane.

4.

The miscellaneous activities—hosting an annual convention, running CLE programs, and publishing the *Texas Bar Journal*—are all germane.  We

---

[34] For example, LAD also provides resources for *pro bono* organizations seeking to assist Texas veterans, help with tax issues, support criminal defense, or address improper conduct by attorneys.

[35] For example, the AJC lobbying for funding for civil legal services, creating *pro bono* opportunities for law students, and providing training for attorneys are all merely supporting *pro bono* work.  And its efforts to help the Supreme Court of Texas make Texas courts more assessable and navigable to low-income Texans, and creating "pro se forms and toolkits" improve the quality of legal services.

[36] For example, AJC "supported two enacted bills that made it easier for people to pass their money and their home outside probate," supported amending the Texas Property Code to "limit dissemination of eviction information," and supported regulations of "wrap-around loans."

explain why.

The Bar's annual convention and CLE offerings help regulate the legal profession and improve the quality of legal services. Both programs assist attorneys in fulfilling requirements designed to ensure that they maintain the requisite knowledge to be competent practitioners. *See, e.g.*, TEX. DISCIPLINARY R. PRO. CONDUCT 1.01 cmt. 8. The plaintiffs' complaint is that some of the convention panels and CLE courses are ideologically charged. Probably so. But that is not the test under *Keller*. And moreover, any objectionable CLE and annual convention offerings are only one part of a large, varied catalogue, and the Bar includes disclaimers indicating that it is not endorsing any of the views expressed. That is enough to satisfy *Keller*.[37]

The *Texas Bar Journal* publishes information related to regulating the profession and improving legal services. Such information includes, among other things, (1) notices regarding disciplinary proceedings against Bar members, *see* TEX. R. DISCIPLINARY P. 6.07; (2) announcements of amendments to evidentiary and procedural rules, *see* TEX. GOV'T CODE § 22.108(c); *id.* § 22.109(c); (3) "public statements, sanctions, and orders" issued by the State Commission on Judicial Conduct, *see id.* § 33.005(e); and (4) articles "devoted to legal matters and the affairs of the [Texas] Bar and its members," TEX. STATE BAR R. art. IX. Moreover, the *Journal* purports to feature articles advancing various viewpoints, and, in any event, includes a disclaimer clarifying that the Bar does not endorse any views expressed therein. That structure suffices under *Keller*.[38]

---

[37] *See, e.g.*, *Schneider*, 917 F.2d at 626, 631 (endorsing "continuing legal education programs" as a permissible activity to fund with mandatory bar dues).

[38] The plaintiffs also reference, in a single sentence, the Bar's spending on advertising. Beyond that, however, they do not explain how it is unlawful, under *Keller*, to

No. 20-50448

\*     \*     \*     \*     \*

In sum, the Bar is engaged in non-germane activities, so compelling the plaintiffs to join it violates their First Amendment rights. There are multiple other constitutional options: The Bar can cease engaging in non-germane activities; Texas can directly regulate the legal profession and create a voluntary bar association, like New York's; or Texas can adopt a hybrid system, like California's. But it may not continue mandating membership in the Bar as currently structured or engaging in its current activities.

## IV.

Assuming, *arguendo*, that the plaintiffs *can* be required to join the Bar, compelling them to subsidize the Bar's non-germane activities violates their freedom of speech.[39] Given that the Bar is engaged in non-germane activities and that its interests fail exacting scrutiny,[40] that is a straightforward application of *Keller*. The Bar may "constitutionally fund activities germane to [regulating the legal profession or improving the quality of legal services] out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity." *Keller*, 496 U.S. at 14. As explained above, parts of the legislative program and the support for AJC are non-germane, so compelling plaintiffs to fund them violates their freedom of speech. They are entitled to summary

---

compel them to support those efforts. "It is not enough to merely mention or allude to a legal theory": "[A] party must 'press' its claims," which means, at a minimum, "clearly identifying a theory as a proposed basis for deciding the case." *United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010). Because the plaintiffs have not met that threshold, they have forfeited any contention related to the advertising expenditures.

[39] "This alternative holding is not dicta. In this circuit, 'alternative holdings are binding precedent and not *obiter dicta*.'" *Ramos-Portillo v. Barr*, 919 F.3d 955, 962 n.5 (5th Cir. 2019) (quoting *Whitaker v. Collier*, 862 F.3d 490, 496 n.14 (5th Cir. 2017)).

[40] *See* Part III.C, *supra*.

judgment on their second claim.

## V.

The plaintiffs maintain that the Bar's procedures for separating chargeable from non-chargeable expenses is constitutionally inadequate.[41] They are, but not for the primary reason the plaintiffs offer.

The plaintiffs contend the Bar's procedures, outlined in Part I.C, *supra*, are constitutionally inadequate in light of recent precedent requiring clear, free, and affirmative consent—i.e., an opt-in system[42]—"before an association can use an individual's coerced fees or dues to support its political and ideological activities." The plaintiffs assert in the alternative that, even if the Bar may use an opt-out refund procedure, its current procedures are still inadequate because the Bar (1) requires members to pay dues before seeking any refund, (2) does not provide adequate notice of its spending as required by *Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292 (1986), and (3) makes refunds available only at the Bar's discretion.

The Bar counters that "nothing in *Keller* mandates that integrated bars adopt the exact procedures *Hudson* outlined," let alone that mandatory bars use an opt-in system. The Bar avers that its current procedures are constitutional under *Keller* because "the Bar provides members with advance,

---

[41] Even if the plaintiffs cannot be compelled to join the Bar because that violates their freedom of association, the adequacy of the Bar's procedures is still relevant. As we clarify today in No. 20-30086, *Boudreaux v. Louisiana State Bar Association*, the inability to identify non-germane expenses is itself a constitutional injury, entitling the plaintiffs to relief. Moreover, because the plaintiffs *can* be compelled to join the Bar if it ceases its non-germane activities, per *Lathrop*, ensuring the Bar has adequate procedures to notify the plaintiffs, and others, that some activities might be non-germane is important.

[42] *See Janus*, 138 S. Ct. at 2486; *Knox*, 567 U.S. at 322.

detailed notice of its proposed expenditures, along with several opportunities to object to those expenditures before they occur." Specifically, the Bar points to (1) the publication of its proposed budget, which itemizes expenditures for particular categories, in the *Texas Bar Journal*; (2) opportunities to object at the budget hearing and the annual Bar Board meeting related to the budget; and (3) the protest procedure, which allows members to object to both proposed and actual expenditures and obtain a refund.

Each side is half right. The plaintiffs are correct that the Bar's procedures are constitutionally wanting, but they are incorrect that, at least under current law, opt-in procedures are required. Though *Janus* and *Knox* indicate that may be the case, *Keller*, despite "its increasingly wobbly, moth-eaten foundations,"[43] remains binding on this court. And *Keller* noted that "an integrated bar could certainly meet its *Abood* obligation by adopting the sort of procedures described in *Hudson*." *Keller*, 496 U.S. at 17.

*Hudson* requires that a public organization collecting mandatory dues and engaging in non-germane conduct have procedures that "include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Hudson*, 475 U.S. at 310. The explanation of the basis of the fee must include "sufficient information to gauge the propriety of the union's fee." *Id.* at 306. *Hudson*'s procedures contemplate an opt-out rule. And *Keller* indicated that *Hudson*'s procedures are sufficient to satisfy a Bar's obligations. Therefore, assuming that plaintiffs can be compelled to join the Bar at all, the Bar may constitutionally use some sort of opt-out procedure for giving pro-rata refunds.

---

[43] *State Oil*, 522 U.S. at 20 (quotation marks omitted).

No. 20-50448

But, though the Bar may use opt-out procedures, its current proce-dures are constitutionally inadequate. The Bar asserts that *Keller* did not hold that *Hudson*'s procedures are constitutionally necessary. That is correct as far as it goes: *Keller* left open whether "one or more alternative procedures would likewise satisfy" the Bar's obligation. *Keller*, 496 U.S. at 17. But *Janus* and *Knox* have subsequently made clear that procedures even more protec-tive than those described in *Hudson* (i.e., opt-in procedures) are necessary in the closely related union context.[44] In the absence of *Keller*'s holding that *Hudson*'s procedures are sufficient, we would be bound to follow the Supreme Court's directive in those cases and require opt-in procedures. But of course, *Keller*'s indication that *Hudson*'s procedures are sufficient remains binding. Therefore, given that *Keller* indicated that *Hudson*'s procedures are sufficient, and *Janus* held even more protective procedures are necessary, *Hudson*'s procedures are *both* necessary and sufficient.[45]

The Bar's procedures are inadequate under *Hudson*. The Bar does not furnish Texas attorneys with meaningful notice regarding how their dues will be spent. Nor does it provide them with any breakdown of where their fees go. Instead, it places the onus on objecting attorneys to parse the Bar's proposed budget—which only details expenses at the line-item level, often

---

[44] "Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, *unless the employee affirmatively consents to pay*." *Janus*, 138 S. Ct. at 2486 (emphasis added); *see also Knox*, 567 U.S. at 312–13 (explaining that the cases approving opt-out procedures were more "historical accident" than "careful application of First Amendment princi-ples"); *id.* at 314 ("By authorizing a union to collect fees from nonmembers and permitting the use of an opt-out system for the collection of fees levied to cover nonchargeable expenses, our prior decisions approach, if they do not cross, the limit of what the First Amendment can tolerate.").

[45] In so holding, we part ways with the Ninth Circuit's decision in *Crowe*, 989 F.3d at 727, and align ourselves instead with the dissent, *see id.* at 734 (Van Dyke, J., dissenting).

without significant explanation—to determine which activities might be objectionable. That is a far cry from a *Hudson* notice, which estimates the breakdown between chargeable and non-chargeable activities and explains how those amounts were determined. *See Hudson*, 475 U.S. at 307 & n.18.

The Bar then leaves the objecting attorney with precious few worthwhile options to express his or her disapproval. Though attorneys may register their complaints with committees and sections or lodge an objection at the Bar's annual hearing on its proposed budget, those processes give cold comfort: Any objector's opposition can be summarily overruled, leaving that lawyer on the hook to fund ideological activities that he or she does not support. To obtain a refund, the Bar requires that attorneys object to a *specific* activity.[46] Moreover, whether a refund is available is left to the sole discretion of the Bar's Executive Director, and refunds are issued only "for the convenience of the Bar." In the event a refund is denied, the objecting attorney is out of luck. *Hudson* requires more than that.

## VI.

Having held that the plaintiffs are entitled to partial summary judgment, we turn to whether they warrant a preliminary injunction pending the remedies stage. They do.

"We review a . . . denial of a preliminary injunction for an abuse of discretion," *Moore v. Brown*, 868 F.3d 398, 402 (5th Cir. 2017), "but we review a decision grounded in erroneous legal principles *de novo*," *City of Dall. v. Delta Air Lines, Inc.*, 847 F.3d 279, 286 (5th Cir. 2017) (quotation marks omitted). As discussed at length, *supra*, the denial of the preliminary

---

[46] *See Schneider*, 917 F.2d at 634–35 (holding that the system for processing objections was constitutionally insufficient under *Keller* where, most relevantly, objecting attorneys had to lodge objections to specific activities in order to receive a refund).

injunction was based on an eroneous holding that the Bar was not engaged in any non-germane activities, so our review is *de novo*.

To obtain a preliminary injunction, the plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The plaintiffs have plainly satisfied the first factor. They are not just likely to succeed on the merits; they have succeeded on the merits already. The remaining factors also support granting the preliminary injunction. First, "[t]he loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality). Next, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quotation marks omitted). Finally, the balance of equities weighs heavily in plaintiffs' favor because the only harm to the Bar is the inability to extract mandatory dues from the plaintiffs in violation of the First Amendment, which is really "no harm at all." *Christian Legal Soc'y v. Walker*, 453 U.S. 853, 867 (2006).

\* \* \*

The district court erred in its reading of *Lathrop* and *Keller* and in its application of *Keller*'s germaneness test to the Bar's activities. We therefore VACATE the summary judgment, RENDER partial summary judgment in favor of the plaintiffs, and REMAND for the court to determine the full scope of relief to which plaintiffs are entitled. We additionally REVERSE the denial of plaintiffs' motion for a preliminary injunction and RENDER a preliminary injunction preventing the Bar from requiring the plaintiffs to join or pay dues pending completion of the remedies phase.