**Opinion issued May 22, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00329-CV**

———————————

**RICHARD ANDERT ROBINS, Appellant**

**V.**

**COMMISSION FOR LAWYER DISCIPLINE, Appellee**

---

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-46488**

---

## MEMORANDUM OPINION

This appeal is from an attorney-discipline proceeding in which a jury found that the attorney engaged in professional misconduct. The trial court entered a judgment disbarring the attorney from practicing law, which the attorney challenges on several procedural and evidentiary grounds. We affirm.

## I. Background

The Commission for Lawyer Discipline brought this disciplinary action alleging that attorney Richard Andert Robins violated multiple provisions of the Texas Disciplinary Rules of Professional Conduct in connection with his representation of Cindy Crisp and one of her heirs in a breach-of-contract case (the "Crisp case"). Robins initially moved to dismiss the Commission's allegations under the Texas Citizen's Participation Act ("TCPA"). *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011. The trial court denied his motion, and he took an interlocutory appeal to this Court. *See Robins v. Comm'n for Lawyer Discipline*, No. 01-19-00011-CV, 2020 WL 101921 (Tex. App.—Houston [1st Dist.] Jan. 9, 2020, pet. denied) (mem. op.). This Court affirmed the denial and remanded for further proceedings on its holding that the Commission had clear and specific evidence of a prima facie case that Robins had engaged in professional misconduct. *Id.* at *8–15. Because the factual allegations in the interlocutory appeal are the same as in this appeal, *see id.* at *1–7, we provide an abridged background here.

### A. The Crisp case

Cindy Crisp suffered from multiple sclerosis, a condition requiring certain medical care. To raise money for her care, in July 2012, Crisp sold some of her personal property to an antiques dealer, John Sauls, for $6,893.21. But the two checks Sauls sent Crisp as payment bounced.

In October 2013, by handwritten letter, Crisp asked Robins to help her recover "the value of the checks plus interest and attorney/court costs." She sent Robins a $350 check to pay the court costs.

Over the next year and a half, Crisp's health declined, and Robins fell out of contact with her. In November 2016, Robins filed suit on Crisp's behalf to collect payment from Sauls for the bounced checks, even though he doubted whether Crisp was still alive. The petition stated that Crisp "would diplomatically settle this case through her legal counsel for $14,338 if no further wrangling is necessary to finally conclude this unfortunate matter."

At some point after the suit was filed, Sauls's attorney, Kurt Noell, sent Robins a cashier's check for $6,893.21 made payable to Crisp and dated January 27, 2017. In March 2017, Noell offered to settle the case for $2,500 for loss of use and attorney's fees, but Robins rejected the offer without attempting to confer with Crisp. No settlement having been reached, Noell served written discovery on Robins.

Around this time, Robins reached out to Crisp's two sons, Austen and Jonathon ("Jon") Clinkenbeard, about the case. They told Robins that Crisp had died in 2015, more than a year before the case was filed. Robins did not take any immediate action to notify either the trial court or Noell of Crisp's death.

When the Crisp case was called to trial in April 2017, Robins failed to appear, and the trial court dismissed the case for want of prosecution. Robins filed "Plaintiff

Cindy Crisp's Verified Motion to Reinstate," claiming he was unaware of the setting but failing to mention Crisp's death, even though he had known of it for more than one month. The trial court granted the motion and reinstated the case.

After the case was reinstated, Noell tried to schedule a deposition of Crisp and compel responses to the written discovery he had served on Robins. According to Noell, Robins discussed scheduling the deposition as if Crisp were still alive, telling Noell that he would confirm whether Crisp could be available on a Saturday. Robins otherwise failed to respond to the discovery, and Noell moved for sanctions and set the motion for a hearing.

Two days before the sanctions hearing, Robins emailed the trial court administrator to say that Crisp was "reportedly no longer with us" but "her son want[ed] to fill in." Robins asked whether the trial court had a "desired protocol for a suggestion of death of a plaintiff" and warned that he could not respond to Noell's discovery requests because Cindy was "reportedly deceased (whether [Noell knew] it or not)." The email did not mention that Crisp had been dead for years.

The trial court held a hearing and directed Robins to produce proof of Crisp's death and postponed the trial for a couple of months. Several events followed.

Robins obtained from Austen a signed retainer agreement, purporting to authorize Robins to represent Crisp through Austen as the representative of "all

4

[Crisp's] heirs and remaining creditors." The retainer agreement did not call for any fee arrangement and instead provided that Robins's fees would be paid by Sauls.

Robins also obtained Crisp's death certificate and emailed it to Noell. Realizing that Crisp may have been deceased when the lawsuit was filed, Noell moved for Robins to show authority under Texas Rule of Civil Procedure 12. *See* TEX. R. CIV. P. 12 (a party may move to require challenged attorney to appear before trial court to show authority to act on client's behalf). The motion questioned whether Robins had authority to file the lawsuit against Sauls and whether Austen, as one of Crisp's two sons, had authority to represent Crisp's estate absent any probate proceedings.

The trial court granted the motion to show authority and ordered Robins to appear with evidence that Crisp authorized him to file the lawsuit and that "a probate proceeding of some type has been filed so that any interest in her estate could be pursued by an heir." Robins filed a response, expressing that "[a] probate court has never been involved with Cindy Crisp's passing or with her estate, and one need not be." Robins pointed to Crisp's October 2013 letter and the retainer agreement signed by Austen as the source of his authority to pursue the Crisp case.

At the show-authority hearing, Robins disclosed that he had not filed a probate proceeding because he had no experience in probate court and was trying to save his clients' money. The trial court expressed concern that Robins had filed the Crisp

5

case "with a client that was deceased" and without the authority of her heirs. When the trial court commented that it was "strange" Robins had only recently informed Noell of Crisp's death, Robins stated, "Well, we were trying to keep this within the settlement range because he was almost there." The trial court stated, "It sounds like you were being dishonest with the opposing party," to which Robins responded, "Dishonest as opposed to saying, 'Hey, I think my client is dead.'" Before ending the hearing, the trial court stated to Robins, "[Y]ou were dishonest." The trial court ordered Robins to submit briefing on his authority to represent Crisp through Austen and warned it would strike Crisp's pleadings if Robins failed to do so.

After the hearing, the Clinkenbeard brothers expressed doubts about Robins's representation and the Crisp case. As Robins was preparing the supplemental briefing ordered by the trial court, he asked the Clinkenbeards to sign affidavits stating that probate of Crisp's estate was not necessary because Crisp had no debt. By email, Jon told Robins that neither he nor Austen could sign the affidavits because Crisp had "debt to the nursing home she was in at the time of her passing and . . . to medicaid/care." Jon said that, after hearing "the judge was upset about possible 'intentional ambiguity' around our mother's death via documentation," he and Austen had "no desire to make that subject any murkier." And in a second email to Robins, Jon asked to look over the case file and to hear about settlement options. He stated that he and Austen no longer wanted to pursue the case on Crisp's behalf

6

because, while their "original motivations" had not changed, their "circumstances" and "feelings about this case certainly ha[d]."

The relationship between the Clinkenbeards and Robins began to deteriorate. After a particularly acrimonious phone call in which Robins accused the Clinkenbeards of sabotaging the Crisp case and told them Crisp had been a burden to him and the state, Jon memorialized his sentiments in an email to Robins, again requesting the case file:

> I'm very upset by how that call went. Neither Austen or I have ever done anything to impede this trial nor have we claimed we wouldn't help. We simply can't sign the affidavits as-is and we've stated that we don't believe we have the time to appear in-person (again).
>
> I don't think that's any reason for threats and insinuating that our mother was and is a burden to you and the state.
>
> Hopefully you can still amend the brief and submit it.
>
> Additionally, as stated previously, we'd like the case file as soon as possible.

Robins responded that he could not recall "when [he] last witnessed such a display of solipsistic callousness by two privileged young men," and he suggested that "any future correspondence be focused on logistics and my damages mitigation." He did not respond to the request for the case file.

Even though the Clinkenbeards had not signed the requested affidavits, Robins filed a supplemental brief with the trial court arguing that the case could proceed with Austen as plaintiff. Robins also filed an amended petition in which he

7

alleged that—despite what the Clinkenbeards told him about Crisp's outstanding debts—no probate proceedings were necessary for Crisp's estate.

The Clinkenbeards eventually terminated Robins's representation and again demanded the case file. Robins again ignored the file request and instead demanded that they pay his attorney's fees and expenses. The trial court ultimately struck Crisp's pleadings, awarded Sauls $250 as sanctions, and dismissed the case.

## B.     The disciplinary action

Austen filed a grievance against Robins. The State Bar classified the grievance as a "Complaint" because it alleged professional misconduct, and on Robins's election, the Commission filed a petition in district court asking that Robins be reprimanded, suspended, or disbarred. *See* TEX. RULES DISCIPLINARY P. R. 2.15 (providing that respondent attorney may elect to proceed in district court instead of having case heard by evidentiary panel appointed by Commission).[1]

The Commission alleged that Robins had violated Texas Disciplinary Rules of Professional Conduct 1.15(d) (requiring lawyer to provide client file upon

---

[1]     The Texas Rules of Disciplinary Procedure "apply prospectively to all attorney professional disciplinary and disability proceedings commenced on and after the effective date as set forth in the Supreme Court's order of promulgation." TEX. RULES DISCIPLINARY P. R. 1.04. Disciplinary proceedings "commenced prior to the effective date of these rules as amended are governed by the Texas Rules of Disciplinary Procedure in effect as of the date of commencement of said disciplinary and disability proceedings." *Id.* We apply the March 22, 2016, version of the Texas Rules of Disciplinary Procedure in effect when this disciplinary action commenced.

termination of representation),[2] 3.01 (prohibiting lawyer from filing frivolous cases), 3.02 (prohibiting lawyer from taking position that causes unreasonable increase in costs or delay), 3.03(a)(2) (prohibiting lawyer from withholding facts from tribunal necessary to avoid assisting in crime or fraud), and 8.04(a)(3) (prohibiting lawyer from engaging in dishonest, fraudulent, or deceitful conduct or misrepresentations). *See* TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 1.15(d) (former version), 3.01–.02, 3.03(a)(2), 8.04(a)(3).

Robins responded,[3] and after discovery and the interlocutory TCPA appeal, the disciplinary case was set for trial. Less than three weeks before the trial setting, Robins filed his "1st Amended Response, Request for Legal & Equitable Relief & Special Exceptions." The pleading asserted several affirmative defenses, including

---

[2] Rule 1.15(d) was redesignated as of October 1, 2024, as Texas Disciplinary Rule of Professional Conduct 1.16(d), without change to the text. *See* Former TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 1.15, adopted by Supreme Court of Texas order of Oct. 17, 1989, eff. Jan. 1, 1990, renumbered as TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 1.16 by Supreme Court of Texas order of Aug. 27, 2024, eff. Oct. 1, 2024. We cite to the former version of the rule in effect when this disciplinary action commenced.

[3] Robins accused Crisp and her sons of misconduct in his response. He alleged that the Clinkenbeard brothers became uncooperative in the Crisp case because they wanted to protect their inheritance of a lake house from Crisp. He asserted that Crisp had transferred her assets, including the lake house to her sons, to avoid "creditor interests such as Medicaid," which had "financed" her care at a public nursing home. Robins later asserted a fraudulent-transfer claim against the Clinkenbeards in a separate lawsuit, and in the same lawsuit, the Clinkenbeards counterclaimed for legal malpractice. *See Robins v. Clinkenbeard*, No. 01-19-00059-CV, 2020 WL 237943, at *1 (Tex. App.—Houston [1st Dist.] Jan. 16, 2020, pet. denied) (mem. op.)

9

a justification defense based on "existing civil procedure code rules and statutory ones" as well as "Texas jurisprudence and Texas Bar ethics opinion authority." The gist of these defenses was that Crisp's claim survived her death.

The pleading also alleged, for the first time, an affirmative counterclaim for religious discrimination under the Texas Religious Freedom Restoration Act ("TRFRA"). *See* TEX. CIV. PRAC. & REM. CODE §§ 110.001–.012. In written discovery responses, the Commission had identified as one factual basis for its claims Robins's assertion that he was not required to disclose the fact of Crisp's death because her family may have wished to pursue cryopreservation, which is a process that may preserve cells, tissues, and organs by freezing them at extremely low temperatures. According to Robins, the Commission's efforts to penalize him for his position on cryogenics violated his religious freedom as a member of the Church of Perpetual Life, which included beliefs that each person is "blessed with one life that has infinite potential *through science*" and that people "are joined together through an alliance of potential universal resuscitation." (Emphasis in original). Robins asserted that his religious beliefs had caused him to avoid rushing to declare Crisp dead.[4] He also asked for a continuance of the trial setting based on the new TRFRA counterclaim.

---

[4]    Nothing in our record suggests that, in the Crisp case, Robins informed the trial court or opposing counsel that he had not disclosed Crisp's death because of his religious beliefs regarding cryogenic preservation.

10

The Commission objected to a continuance and moved to strike the newly pleaded defenses and TRFRA counterclaim. The Commission argued that the defenses and TRFRA counterclaim should be struck or severed from the disciplinary action because: (1) they were untimely; (2) the allegations therein contradicted Robins's discovery responses and pleadings stating that he failed to disclose the fact of Crisp's death because he was uncertain whether she had actually died, not because of any religious beliefs; (3) the counterclaim did not satisfy the elements of TRFRA; (4) the judge in a disciplinary action has no authority over separate claims not provided for in the disciplinary rules; and (5) the amended pleading and continuance request were intended to delay the trial.

After a hearing, the trial court denied the continuance request, struck several of Robins's defenses, and dismissed the TRFRA counterclaim because it had no "relevance" in the trial of the disciplinary case.

## C.  The jury verdict and subsequent judgment of disbarment

The discipline case proceeded to a jury trial at which Noell, both Clinkenbeard brothers, and Robins testified. After the close of evidence, the jury deliberated and returned findings that Robins had engaged in professional misconduct by:

- failing to take steps to the extent reasonably practicable to surrender the Clickenbeards' client file, in violation of Rule 1.15(d);

- asserting or controverting an issue in the Crisp case, in the absence of a reasonable belief that the basis for doing so was not frivolous, in violation of Rule 3.01;

11

- taking a position in the Crisp case that unreasonably increased the costs or other burdens of the case or that unreasonably delayed resolution of the matter, in violation of Rule 3.02;

- failing to disclose a fact to the tribunal in the Crisp case, when disclosure was necessary to avoid assisting a criminal or fraudulent act, in violation of Rule 3.03(a)(2); and

- engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of Rule 8.04(a)(3).

The trial court then held a separate evidentiary hearing to determine what sanction was appropriate considering the jury's findings. It ultimately signed a judgment disbarring Robins and requiring him to remit his law license. The trial court also ordered Robins to pay the Commission's attorney's fees and transmit the cashier's check he had been holding to Austen as an ancillary sanction.

At Robins's request, the trial court issued findings of fact and conclusions of law. Among other things, the trial court found:

- Robins's failure to surrender the case file upon request, after termination of the representation, required Austen's new counsel to defend him in a separate lawsuit without the benefit of the case file, causing delay and increased litigation costs, all to the detriment of his former client.

- When Robins, while representing Austen, asserted or controverted an issue in the Crisp case in the absence of a reasonable belief that the basis for doing so was not frivolous, he took this action to benefit himself and to the detriment of his client.

- When Robins, while representing Austen, took a position that unreasonably increased the costs or other burdens of the Crisp case or unreasonably delayed resolution of the matter, he took this action to benefit himself and to the detriment of his client.

12

- When Robins, while representing Austen, failed to disclose Crisp's death to the tribunal, considering disclosure was necessary to avoid assisting a criminal or fraudulent act, he did so to protect himself and to the detriment of his client, causing delay and increased costs of litigation.

- Robins's conduct involving dishonesty, fraud, deceit, or misrepresentation in his representation of Austen continued during the disciplinary action and resulting trial.

- Robins's conduct during the trial was grossly unprofessional and evidenced a lack of respect for the legal profession.

- Robins's testimony rationalizing his actions was not credible.

- Robins's conduct was aggravated by (1) his refusal to acknowledge any wrongdoing on his part, (2) the vulnerable nature of his clients, (3) the way he communicated with his clients with degrading and condescending names and comments, and (4) the seriousness and degree of professional misconduct.

Robins requested additional findings of fact and conclusions of law, which the trial court denied. Robins filed a motion for new trial, which was overruled by operation of law, in which he complained about several procedural and evidentiary errors. Among other things, Robins complained that the trial court had abused its discretion by denying him a continuance of the trial and striking his defenses and TRFRA counterclaim, that the evidence did not support either the jury's verdict or the trial court's findings and conclusions, that additional jury instructions should have been given, and that a juror had engaged in misconduct when he was caught

talking to an alternate juror about an internet search of "matters directly involving the case." This appeal followed.[5]

## II.  Dismissal of Counterclaim and Defenses

In his first issue, Robins argues the trial court erred by dismissing his "defenses and counter-claims pursuant to [TRFRA]" because the Commission does not have sovereign immunity from "TRFRA scrutiny."

Robins's counterclaim alleged a violation of TRFRA, which prohibits a government agency from "substantially burden[ing] a person's free exercise of religion" unless it "demonstrates that the application of the burden to the person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." TEX. CIV. PRAC. & REM. CODE § 110.003(a)–(b). A person who successfully establishes a violation may recover declaratory relief, injunctive relief to prevent future violations, and compensatory damages not to exceed $10,000, plus attorney's fees and other expenses incurred in bringing the action. *Id.* § 110.005(a)–(b).

In addressing the Commission's motion to strike, the trial court discussed with the parties the fact that there is no evidence Crisp had been cryogenically preserved and was not actually deceased and then expressed this means Robins's religious

---

[5]  Robins requested to transfer this appeal to the Court of Appeals for the Fifteenth District of Texas. The Supreme Court of Texas denied the request. *See* Misc. Docket No. 24-9104 (Tex. Dec. 13, 2024).

14

belief did not have "relevance to this trial . . . so I'm going to dismiss" the counterclaim. Robins agreed he did not expect there to be evidence Crisp had been cryogenically preserved but explained that she might have been, especially because the Clinkenbeard brothers may not have wanted their father to know her whereabouts, so based on that possibility and his religious beliefs, he did not disclose that she had died. The trial court then stated, "I have granted the motion to dismiss the claim based on TRFRA."

The Commission asserted in its motion to dismiss that the counterclaim should be dismissed because of a lack of support for Robins's belated religious-discrimination theory, because counterclaims are not authorized under the disciplinary rules, and because the Commission is immune from the counterclaim. On appeal, Robins challenges only the immunity ground.

An appellant must attack all independent grounds that fully support a complained-of ruling. *See City of Mont Belvieu v. Enter. Prods. Operating, LP*, 222 S.W.3d 515, 519 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Britton v. Tex. Dep't of Crim. Just.*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.). "If an appellant does not, then we must affirm the ruling or judgment." *Britton*, 95 S.W.3d at 681. The rule that an appellant must attack all independent grounds supporting a ruling is premised on appellate courts' inability to "alter an erroneous judgment in favor of an appellant in a civil case who does not challenge

that error on appeal." *Id.* We must accept the validity of the unchallenged independent ground, and thus any error as to the challenged ground is harmless. *See Enriquez v. Morsy*, No. 01-22-00622-CV, 2023 WL 7311220, at \*8 (Tex. App.—Houston [1st Dist.] Nov. 7, 2023, pet. denied) (mem. op.). Accordingly, because Robins does not challenge on appeal all the independent grounds for the dismissal of his counterclaim, we must affirm that dismissal.

We note Robins's issues complain of the dismissal of his counterclaim "and defenses." Reading Robins's briefing liberally, we find an assertion in his supplemental letter brief of a defense based on the disciplinary rules being unconstitutional as applied to him. In support, he cites the Supreme Court of Texas's instruction that a "law that imposes penalties must be plain enough to advise persons affected by it when and under what circumstances their acts and conduct would breach its terms." *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 718 (Tex. 2024) (citation and internal quotations omitted) (requiring, in case involving regulation of health care workers who participate in federal Medicaid program, strict construction of penal laws that suffer from uncertainty). While Robins complained generally in the trial court that ambiguities in the disciplinary rules should be construed against the Commission, he did not specify below or here which disciplinary rules he contends are ambiguous or uncertain as applied to him or explain why the rules are ambiguous or uncertain. *See Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d

16

504, 518 (Tex. 1995) (stating that, in as-applied constitutional challenge, challenger must show statute in issue is unconstitutional when applied to the challenger because of challenger's particular circumstances). Consequently, this argument is waived. *See* TEX. R. APP. P. 33.1(a)(1)(A) (requiring timely and specific objection in trial court to preserve error); TEX. R. APP. P. 38.1(i) (requiring appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to appropriate authorities and to the record"); *Ramirez v. Dep't of Fam. & Protective Servs.*, 667 S.W.3d 340, 347–48 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (constitutional complaints waived due to inadequate briefing).

To the extent Robins complains about other defenses that were erroneously dismissed or struck, he does not specify those defenses. And so, we must reach the same conclusion as we did with respect to his TRFRA counterclaim, based on the same reasoning. That is, the Commission challenged the defenses pleaded in Robins's "1st Amended Response, Request for Legal & Equitable Relief & Special Exceptions" on multiple independent grounds, which Robins has not challenged on appeal. *See Britton*, 95 S.W.3d at 680–81.

We accordingly overrule Robins's first issue.

### III. Sufficiency of the Evidence

The Commission alleged—and the jury found—that Robins engaged in professional misconduct by violating Rules 1.15(b) (requiring lawyer to provide

17

client file upon termination of representation), 3.01 (prohibiting lawyer from filing frivolous cases), 3.02 (prohibiting lawyer from taking position that causes unreasonable increase in costs or delay), 3.03(a)(2) (prohibiting lawyer from withholding facts from tribunal necessary to avoid assisting in crime or fraud), and 8.04(a)(3) (prohibiting lawyer from engaging in dishonest, fraudulent, or deceitful conduct or misrepresentations). *See* TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 1.15(d) (former version), 3.01–.02, 3.03(a)(2), 8.04(a)(3).

In his second issue, Robins asserts that "[t]he evidence purportedly against [him] in this case does not justify findings that the [Commission] has shown that he violated its (vague and even contradictory) ethics rules." We presume, under a liberal reading of Robins's appellate briefing, that this issue challenges the legal and factual sufficiency of the evidence to support the jury's findings of professional misconduct.[6] *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) ("Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver."). Within our sufficiency-of-the-evidence analysis we also consider, as appropriate and necessary to the disposition of this appeal, Robins's arguments that the disciplinary rules were incorrectly applied against him.

---

[6]     Nothing in Robins's brief can be reasonably read as challenging the trial court's conclusion that disbarment is an appropriate sanction. Hence, we do not address that issue.

18

## A.  Standard of review

To decide whether the evidence is legally sufficient, we examine the record for evidence and inferences supporting the jury's finding and disregard all contrary evidence and inferences.  *Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 780 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  A party challenging the legal sufficiency of an adverse finding on an issue for which he did not have the burden of proof at trial must show that there is no evidence to support the finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).  We will sustain a no-evidence challenge if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact.  *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).  "Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact."  *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (internal quotation omitted).  "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (internal quotation omitted).

To decide whether the evidence is factually sufficient, we consider all the evidence in the record, both for and against the jury's finding. *See Hartford Fire Ins. Co.*, 287 S.W.3d at 781. Evidence is factually insufficient if the jury's finding "'is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.'" *Id.* (quoting *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). As the factfinder, the jury determines the credibility of the witnesses and the weight to be given their testimony, decides whether to believe or disbelieve all or any part of the testimony, and resolves any inconsistencies in the testimony. *Ulogo v. Villanueva*, 177 S.W.3d 496, 499–500 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Accordingly, when there is conflicting evidence, we defer to the jury. *See id.*

To the extent our analysis depends on interpretation of the disciplinary rules, we note the rules are promulgated by the Supreme Court of Texas as minimum standards of conduct required of lawyers to avoid disciplinary action. *See* TEX. DISCIPLINARY RULES OF PROF'L CONDUCT preamble ₽ 7. Promulgated rules have the same force and effect as statutes. *Comm'n for Lawyer Discipline v. Hanna*, 513 S.W.3d 175, 178 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Love v. State Bar of Tex.*, 982 S.W.2d 939, 942 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Thus, we apply the rules of statutory construction in interpreting the disciplinary rules. *See O'Quinn v. State Bar of Tex.*, 763 S.W.2d 397, 399 (Tex. 1988) ("[O]ur disciplinary rules should be treated like statutes."); *Hanna*, 513 S.W.3d at 178 (applying statutory

construction rules to analysis of the disciplinary rules).  When a party challenges the trial court's construction of a statute or application of the law, the standard of review is de novo.  *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 67–68 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

## B.  Burden of proof

To the extent Robins's briefs can be read as complaining that the trial court applied the wrong burden of proof, the record refutes the complaint.  The Texas Rules of Disciplinary Procedure explicitly state that disciplinary cases are civil in nature and require the Commission to prove its allegations by a preponderance of the evidence.  *See* TEX. RULES DISCIPLINARY P. R. 3.08C; *see also State Bar of Tex. v. Evans*, 774 S.W.2d 656, 657 n.1 (Tex. 1989) (disapproving of court of appeals' statements that disciplinary actions are "quasi-criminal in nature" because "[c]lear Texas authority is that disciplinary actions are civil in nature"); *Hamlett v. Comm'n for Lawyer Discipline*, 538 S.W.3d 179, 181 (Tex. App.—Amarillo 2017, no pet.) (confirming application of the preponderance-of-the-evidence standard in disciplinary actions).  Once Robins elected to have the disciplinary case heard by a district court, the Commission was obliged to prove its case against him by a preponderance of the evidence.  *See* TEX. RULES DISCIPLINARY P. R. 3.08C.

The jury charge instructed that a "yes" answer as to any act of professional misconduct must be based on a preponderance of the evidence, which was correctly

defined as "the greater weight of credible evidence presented in this case." *See Murff v. Pass*, 249 S.W.3d 407, 411 n.1 (Tex. 2008) (noting that preponderance-of-the-evidence standard requires "the greater weight of the credible evidence" (internal quotation omitted)); *Comm'n for Lawyer Discipline v. Rosales*, 577 S.W.3d 305, 317 n.3 (Tex. App.—Austin 2019, pet. denied) ("A preponderance of the evidence is that quantum of evidence allowing a determination that is more likely true than not."). The trial court thus applied the correct burden of proof. *See* TEX. RULES DISCIPLINARY P. R. 3.08C.

## C. Refusing to turn over client file under former Rule 1.15(d)

The court's charge asked the jury to decide whether, "upon termination of representation," Robins "failed to take steps to the extent reasonably practicable to surrender papers and property to which Austen Clinkenbeard and/or Jon Clinkenbeard were entitled." The court's charge instructed that, for the purpose of this question,

> [T[he documents, papers, and other information received from a client or received or generated in the course of representing the client are the property of the client. The lawyer may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation.

The jury answered affirmatively, thereby finding a violation of former Rule 1.15(d). *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d) (former version) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably

22

practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled . . . .").

The record shows that the Clinkenbeard brothers made several requests of Robins to turn over their case file. Without disputing the fact of these requests, Robins makes multiple arguments to avoid application of Rule 1.15(d), none of which are availing and many of which were previously rejected in the interlocutory TCPA appeal. *See Robins*, 2020 WL 101921, at \*13–14.

For instance, Robins says the purpose of this rule is "*not* to empower disputants in a contract dispute to try to predatorily discredit and otherwise harm a lawyer who asserts his or her rights in a dispute." That assertion overlooks the charge instruction quoted above, which makes clear the documents, papers, and information received or generated by a lawyer during a case belong to the client.[7] *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d) (former version); *see also In re McCann*, 422 S.W.3d 701, 704 (Tex. Crim. App. 2013) (orig. proceeding)

---

[7] We note the list of issues presented in Robins's brief includes a sub-issue complaining that "the visiting trial judge erroneously excluded *all* of [his] proposed & written jury instructions & charges." But nowhere in his brief does Robins identify which instructions the trial court should have included in its charge or how error was preserved as to the requested instructions. Consequently, to the extent Robins intended to raise jury-charge error, he has forfeited it. *See* TEX. R. APP. P. 38.1(i); *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 500 (Tex. 2015) ("Failure to provide citations or argument and analysis as to an appellate issue may waive it."); *see also Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding, when no objection is made to jury charge, sufficiency of evidence is measured against charge given by court rather than some other unidentified law).

23

("To whom does a client's file belong? The client's file belongs to the client."); *In re George*, 28 S.W.3d 511, 516 (Tex. 2000) (orig. proceeding) ("The attorney is the agent of the client, and the work product generated by the attorney in representing the client belongs to the client.").

Robins also argues that Rule 1.15(d) applies only to cases that are being turned over to another attorney for further litigation, as opposed to Crisp's case, which Robins claims the Clinkenbeard brothers "wanted to terminate . . . as they did not welcome scrutiny of their inheritance (a lake house) from their mother, Cindy Crisp, who nevertheless left taxpayers with Medicaid-financed nursing home bills." We did not address the merits of this argument in Robins's interlocutory TCPA appeal because he offered "no authority or legal analysis for his assertion other than that it is 'self-evident.'" *Robins*, 2020 WL 101921, at *14. Robins's brief in this appeal retains the same dearth of authority or analysis, so we again do not address the merits of this argument. *See* TEX. R. APP. P. 38.1(i).

Robins's next argument—that the Clinkenbeard brothers were not specific enough about which documents they sought when they requested the file—rests on inapplicable authority. Specifically, he cites Texas Rule of Appellate Procedure 34.5(b)(2), which addresses requests for items to be included in the appellate record. *See* TEX. R. APP. P. 34.5(b)(2). As we stated in the interlocutory TCPA appeal, this rule is "clearly inapplicable here." *Robins*, 2020 WL 101921, at *14. Further, as

Jon testified, the Clinkenbeard brothers did not know what to request because they did not know what was in the case file. And while Robins asserted that he had turned over everything to the Clinkenbeard brothers either "satisfactorily through e-mails" or when he asked Austen to print "copious exhibits" before a hearing, the jury was free to disbelieve his assertions, especially because it was undisputed that Robins never turned over to Austen the $6,893.21 cashier's check made payable to Crisp and dated January 27, 2017, instead maintaining possession of the check until the time of trial in this disciplinary matter. *See Ulogo*, 177 S.W.3d at 499–500. It is also notable that when Austen sent Robins the email terminating his representation and once again demanding the file, Robins's response email did not address the repeated requests for the file, but instead expressed surprise at Austen's email by asking whether it was sent by a hacker, notwithstanding the fact that Austen had previously expressed disappointment in Robins's representation.

Finally, Robins reasserts that he was not required to turn over the case file because he asserted a lien over it. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d) (former version); *see also* TEX. COMM. ON PROF'L ETHICS, Op. 610, 74 TEX. B.J. 857, 858 (2011) ("[A] lawyer has a right to claim a possessory lien against a client's property, money, and papers for the payment of amounts due the lawyer for services and expenses."). As we noted in the interlocutory TCPA appeal, retention of a client's file is permitted only if allowed by law and doing so will not

prejudice the client in the subject matter of the representation. *See Robins*, 2020 WL 101921, at \*14; *see also* TEX. COMM. ON PROF'L ETHICS, Op. 610, 74 TEX. B.J. at 858 ("[T]his lien on a client's documents is subject to the important limitation set forth in Rule 1.15(d) . . . that a lawyer 'may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation.'").

In their emails to Robins, the Clinkenbeard brothers repeatedly expressed their concern over his representation in the Crisp case, and thus they were prejudiced by not being able to review the file to assess whether they wanted to continue with Robins's representation or shift the representation to a different lawyer. Austen specifically testified he wanted to see the file "to potentially at that time discuss with my brother, you know, seeking new counsel if we did decide we wanted to pursue this matter further or, you know, try to find some sort of understanding of what was actually going on."

Furthermore, liens against a client's file are for "payment of amounts due the lawyer for services and expenses." *Robins*, 2020 WL 101921, at \*14 (quotation omitted). The Commission presented evidence—including the retainer agreement signed by Austen and statements in the emails between Robins and the Clinkenbeard brothers—that Robins agreed his fees would be paid by Sauls, and not by the

26

Clinkenbeard brothers. Accordingly, Robins had no basis to assert an attorney's fees lien on the client file.

On this record, we cannot conclude there was "no evidence" to support the jury's finding that Robins "failed to take steps to the extent reasonably practicable to surrender papers and property to which Austen Clinkenbeard and/or Jon Clinkenbeard were entitled." *See Exxon Corp.*, 348 S.W.3d at 215. Nor can we conclude that the jury's finding was "clearly wrong and manifestly unjust." *See Hartford Fire Ins. Co.*, 287 S.W.3d at 781. Thus, we hold the jury's finding of a Rule 1.15(d) violation is supported by legally and factually sufficient evidence.

## D. Continuing to litigate a suit without a basis for doing so under Rule 3.01

The court's charge asked the jury to decide whether, while representing the Clinkenbeard brothers or Crisp in the Crisp case, Robins "asserted or controverted an issue in that proceeding in the absence of a reasonable belief that the basis for doing so was not frivolous." The court's charge instructed that, for the purpose of this question, "a filing or contention is frivolous if it is groundless, filed in bad faith, filed for an improper purpose or for harassment." It did not define a "reasonable belief." But the terminology section of the disciplinary rules provides that a "reasonable belief," when used in reference to a lawyer, "denotes that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable." TEX. DISCIPLINARY RULES OF PROF'L CONDUCT terminology. The jury

27

answered the question affirmatively, thereby finding a violation of Rule 3.01. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.01 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous.").

In Robins's interlocutory TCPA appeal, we recognized several important legal principles that apply equally in our review of the final judgment of disbarment. First, "that a deceased person does not have actual or legal existence and therefore cannot bring suit." *Robins*, 2020 WL 101921, at *9. Second, that in "cases where a plaintiff dies after having filed suit, claims that survive her death belong to her heirs, subject to the administration of her estate." *Id.* And third, that while the deceased plaintiff's estate itself "cannot pursue such claims, it may do so through a representative." *Id.*; *see also Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005) ("Certain individuals are afforded the capacity to bring a claim on an estate's behalf. In general, only the estate's personal representative has the capacity to bring a survival claim.").

Even assuming Robins reasonably believed that it was not frivolous to file suit on Crisp's behalf absent certainty about her death, there was evidence from which a jury could find that a reasonably prudent lawyer would not believe there was a non-frivolous basis for continuing to litigate the Crisp case as Robins did after confirming Crisp's death. For instance, it is undisputed that by March 2017, the Clinkenbeard

28

brothers had informed Robins of Crisp's death, yet Robins continued to prosecute the suit as if she were still alive, including by moving to reinstate the case after it was dismissed for want of prosecution and discussing her availability for a deposition without mentioning her death. Noell testified that, in his thirty-nine years of practicing law, he had never encountered a case in which counsel handled a plaintiff's death as Robins did.

Although Robins eventually sought to substitute Austen as Crisp's representative, it was necessary to plead and prove that no estate administration was pending or necessary. *See Shepherd v. Ledford*, 962 S.W.2d 28, 31–32 (Tex. 1998) (holding that heirs at law can maintain survival suits if they "allege and prove that there is no administration pending and none necessary"). Robins's correspondence with the Clinkenbeard brothers and pleadings demonstrate his understanding of this requirement. When the Clinkenbeard brothers refused to sign affidavits that Crisp had no debts, they denied Robins the necessary proof that probate was not required. Yet Robins still filed a brief affirmatively stating that because Crisp had no debts, the case could proceed with Austen as plaintiff. He also amended the petition to add Austen as a plaintiff and allege that no probate proceedings were necessary, notwithstanding that Crisp had debt.

Based on these and other examples in the record, we cannot conclude there was "no evidence" to support the jury's finding that Robins "asserted or controverted

29

an issue in [the Crisp case] in the absence of a reasonable belief that the basis for doing so was not frivolous." *See Exxon Corp.*, 348 S.W.3d at 215. Nor can we conclude the jury's finding was "clearly wrong and manifestly unjust." *See Hartford Fire Ins. Co.*, 287 S.W.3d at 781. Thus, we hold the jury's finding of a Rule 3.01 violation is supported by legally and factually sufficient evidence.

### E. Causing unreasonable delay and costs under Rule 3.02

The court's charge asked the jury to decide whether, while representing the Clinkenbeard brothers or Crisp in the Crisp case, Robins "took a position that unreasonably increased the costs or other burdens of the case or that unreasonably delayed resolution of the matter." The jury again answered affirmatively, thereby finding a violation of Rule 3.02. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.02 ("In the course of litigation, a lawyer shall not take a position that unreasonably increases the costs or other burdens of the case or that unreasonably delays resolution of the matter.").

The evidence supports the jury's finding. As stated above, although the Clinkenbeard brothers informed Robins of Crisp's death in March 2017, Robins did not alert the court or opposing counsel of this fact for three months (and just two days before the hearing scheduled on a motion to sanction Robins for failing to respond to discovery). The record includes evidence that Robins's decision to withhold his knowledge of Crisp's death caused his opposing counsel, Noell, to have

30

to file additional motions and briefing and caused the court to have to hold a hearing to determine whether Robins was authorized to continue prosecuting the suit against Sauls on Crisp's behalf. The issues related to Robins's authority to prosecute Crisp's case, or lack thereof, took about four months to resolve and required more than one hearing. Noell testified that he had never had a case involving a small amount-in-controversy take so long to resolve.

The evidence also included exhibits and testimony from which the jury could infer that Noell performed work on Sauls's behalf that he might have performed differently or not at all had he known Crisp was deceased, such as engaging in settlement negotiations that Crisp could not participate in, drafting and sending discovery requests that Crisp could not answer, and attempting to arrange a deposition Crisp could not attend.

Robins seems to suggest that his decision to withhold the fact of Crisp's death from the trial court and opposing counsel was not unreasonable for two reasons: (1) he was entitled to pursue the claim and fees for that pursuit under the authority of Crisp's initial letter and the subsequent retainer agreement with Austen; and (2) Noell never offered on behalf of Sauls to pay Robins's fees. But the jury, as the factfinder, could have found that such explanations for waiting three months to alert opposing counsel and the court of his client's death were not reasonable. *See Ulogo*, 177 S.W.3d at 499–500.

Robins also suggests that this finding cannot stand based on the rule's comment that "[a] lawyer's obligations [thereunder] are substantially fulfilled by complying with Rules 3.01, 3.03, and 3.04 as supplemented by applicable rules of practice or procedure." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.02 cmt. 2. For reasons explained elsewhere in this memorandum opinion, we have concluded there is legally and factually sufficient evidence that Robins did not comply with either Rule 3.01 or Rule 3.03. And Rule 3.04—which generally prohibits a lawyer from falsifying, destroying, or concealing evidence; unlawfully paying a witness for their testimony; degrading a witness; or employing obstructive measures during discovery—was not at issue here.

On this record, we cannot conclude there was "no evidence" to support the jury's finding that Robins "took a position that unreasonably increased the costs or other burdens of the case or that unreasonably delayed resolution of the matter." *See Exxon Corp.*, 348 S.W.3d at 215. Nor can we conclude the jury's finding was "clearly wrong and manifestly unjust." *See Hartford Fire Ins. Co.*, 287 S.W.3d at 781. Thus, we hold the jury's finding of a Rule 3.02 violation is supported by legally and factually sufficient evidence.

## F. Engaging in fraudulent conduct under Rule 3.03(a)(2)

Rule 3.03—entitled "Candor Toward the Tribunal"—prohibits a lawyer from knowingly "fail[ing] to disclose a fact to a tribunal when disclosure is necessary to

avoid assisting a criminal or fraudulent act." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.03(a)(2). Relevant to this rule, the jury was asked to decide whether, while representing the Clinkenbeard brothers or Crisp in the Crisp case, Robins "failed to disclose a fact to a tribunal when disclosure was necessary to avoid assisting a criminal or fraudulent act." The trial court instructed the jury that "an act is 'fraudulent' if it has a purpose to deceive and not merely negligent misrepresentation or failure to apprise another of relevant information." The jury answered affirmatively.

The record contains evidence from which the jury could reasonably find a violation of this standard. After finally disclosing Crisp's death to the trial court, Robins represented in court filings that Crisp did not have any debt requiring probate of her estate and failed to disclose that Crisp had debt to her nursing home and to "medicaid/care," as represented to him in writing by Jon. The jury reasonably could conclude this action was more than a negligent misrepresentation or failure to apprise the court of relevant information and instead evidenced a purpose to deceive.

That is, there was evidence that Robins failed to disclose that Crisp was deceased and that she had outstanding debts to deceive for the purpose of keeping litigation going for his own financial gain. For instance, an email to the Clinkenbeard brothers shows that Robins's decision was motivated by his desire to avoid discovery sanctions by having the brothers sign a retainer agreement and then

33

updating the discovery he had been unable to answer since he did not have a living client. When the trial court asked Robins about his failure to disclose Crisp's death, he stated that he did not want to derail the parties' negotiations, which he believed were close to resulting in a settlement, something the trial court found to be dishonest.

On this record, we cannot conclude there was "no evidence" to support the jury's finding that Robins "failed to disclose a fact to a tribunal when disclosure was necessary to avoid assisting a criminal or fraudulent act." *See Exxon Corp.*, 348 S.W.3d at 215. Nor can we conclude the jury's finding was "clearly wrong and manifestly unjust." *See Hartford Fire Ins. Co.*, 287 S.W.3d at 781. Thus, we hold the jury's finding of a Rule 3.03(a)(2) violation is supported by legally and factually sufficient evidence.

## G. Engaging in fraudulent and dishonest conduct under Rule 8.04(a)(3)

Rule 8.04 is found in the section of the disciplinary rules for maintaining the integrity of the legal profession. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 8.01–.05. It provides that a lawyer "shall not . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 8.04(a)(3). Relevant to this rule, the jury was asked to decide whether Robins "engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in connection with the matter in this disciplinary action." The trial

court instructed the jury that "dishonest" means a "lack of honesty, probity, or integrity in principle" and "lack of straightforwardness." The trial court further instructed the jury that a "yes" answer to any of the preceding forms of misconduct results in "yes" answer to this question, an instruction Robins does not challenge on appeal. The jury again answered affirmatively.

Robins cites a recent decision from the Supreme Court of Texas as support for his contention that Rule 8.04(a)(3) should not be applied to him. *See Webster v. Comm'n for Lawyer Discipline*, 704 S.W.3d 478 (Tex. 2024). He asserts that the Supreme Court in *Webster* "described the anti-misrepresentation rule that the Texas Bar used to try to disbar [an assistant attorney general] (just as it did with Appellant Robins) as 'unbounded' 'vague' and 'eschewing any limiting principle.'" But Robins's assertion must be considered in the specific context of the *Webster* decision.

The issue in *Webster* was whether sovereign immunity or the separation-of-powers doctrine protects government lawyers from disciplinary action arising from alleged misrepresentations made to a court. The Commission sought to discipline the first assistant attorney general for filing an original action on behalf of Texas in the Supreme Court of the United States concerning the conduct of the 2020 presidential election. *Id.* at 483. The Commission alleged that statements the first assistant made in the initial pleading about illegal votes being cast in the election

35

and concerns of unconstitutional conduct by states violated Rule 8.04(a)(3) because they were not "supported by any charge, indictment, judicial finding, and/or credible or admissible evidence." *Id.* at 486. On the first assistant's plea to the jurisdiction, the district court dismissed the case on the ground that exercising jurisdiction over the Commission's lawsuit would violate the separation-of-powers doctrine, and the Supreme Court of Texas agreed. *Id.* at 483.

The Court noted, "What makes this case different from ordinary litigation . . . is its constitutional dimension. By second-guessing the contents of initial pleadings filed on behalf of the State of Texas, under the attorney general's authority, the commission has intruded into terrain that this Court's precedent has described as belonging to the attorney general." *Id.* at 484. In that context, the Court criticized the Commission's interpretation of Rule 8.04(a)(3):

> The theory of the commission's case against the first assistant is that he is liable for having "engage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation," because his six alleged misrepresentations were not "supported by any charge, indictment, judicial finding and/or credible or admissible evidence." Eschewing any limiting principle, the commission commits to a reading of Rule 8.04(a)(3) that it says is "broa[d] in scope" and that denotes "a lack of honesty, probity, or integrity in principle" as well as a "lack of straightforwardness."

*Id.* at 498–99 (internal citation omitted). The Court described the Commission's reading as "unbounded" and belying the Commission's suggestion that it was "simply attempting to hold the first assistant to the same standards of professional conduct." *Id.* at 499. The Court found the "deployment of Rule 8.04(a)(3) at the

36

pleadings stage" against an executive-branch attorney "particularly problematic" because it created constitutional friction. *See id.* The Court expressed doubt that it would be "permissible to scrutinize initial pleadings even in purely *private* litigation," but it did not resolve that question. *Id.* (emphasis in original).

*Webster* is distinguishable for a few reasons. First, of course, the separation-of-powers doctrine is not implicated here because Robins, unlike the first assistant, is not a government attorney. Additionally, while we are cognizant of the Court's doubt about Rule 8.04(a)(3)'s use for initial pleadings, the Commission's allegations and proof here involved much more than that. Robins admitted that he had been unable to reach Crisp and that he was not certain she was alive when he filed suit on her behalf. But even after learning of Crisp's death, Robins proceeded as though he still had a living client. Robins represented to Noell that Crisp was alive when he declined a settlement offer on her behalf.[8] And he discussed possible dates for Crisp's deposition with Noell as if Crisp was alive. When he finally informed the trial court of Crisp's death three months later, it was just two days before a hearing scheduled on Noell's motion for discovery sanctions. Additionally, as described above, a jury reasonably could conclude from the evidence at trial that Robins

---

[8] A lawyer has an ethical obligation to abide by his client's decision whether to accept a settlement offer. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT 1.02(a)(2) (subject to certain exceptions, lawyer must abide by client's decision "whether to accept an offer of settlement of a matter").

consciously perverted the truth by withholding the fact of Crisp's death and the need for probate of her estate in order to continue the litigation for his own gain.

Under the unique circumstances of this case, we cannot conclude there was "no evidence" to support the jury's finding that Robins "engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in connection with the matter in this disciplinary action." *See Exxon Corp.*, 348 S.W.3d at 215. Nor can we conclude the jury's finding was "clearly wrong and manifestly unjust." *See Hartford Fire Ins. Co.*, 287 S.W.3d at 781. Thus, we hold the jury's finding of a Rule 8.04(a)(3) violation is supported by legally and factually sufficient evidence.

For all the reasons above, we overrule Robins's second issue challenging the legal and factual sufficiency of the evidence that he violated Rules 1.15(d), 3.01, 3.02, 3.03(a)(2), and 8.04(a)(3). *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d) (former version), 3.01–.03(a)(2), 8.04(a)(3).

## IV.   Juror Misconduct

Robins's appellate brief contains a third issue complaining that "[j]uror misconduct unfortunately plagued the jury from start to finish." But the issue is wholly unaddressed in the argument section of Robins's brief. *See* TEX. R. APP. P. 38.1(i). That is, beyond general framing in his statements of the issues presented, Robins has not made any argument regarding juror misconduct or cited any authority or the record to support the issue. *See Ross v. St. Luke's Episcopal Hosp.*, 462

38

S.W.3d 496, 500 (Tex. 2015) ("Failure to provide citations or argument and analysis as to an appellate issue may waive it."); *Guimaraes v. Brann*, 562 S.W.3d 521, 538 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (failure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the compliant). We strive to reach the merits of an issue whenever reasonably possible, *see Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162 (Tex. 2012), but Robins's third issue presents nothing for our review.

Even if we presume, as the Commission has in its responsive briefing, that Robins's jury-misconduct issue relates to the point in his motion for new trial about a juror attempting to research him on the internet, the record does not show an abuse of the trial court's discretion. *See Holland v. Lovelace*, 352 S.W.3d 777, 783 (Tex. App.—Dallas 2011, pet. denied) (courts "review a trial court's denial of a motion for new trial based on jury misconduct under an abuse of discretion standard").

To obtain a new trial on the ground of jury misconduct, Robins must establish that the misconduct (1) occurred, (2) was material, and (3) probably caused injury. *See* TEX. R. CIV. P. 327(a); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000). To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he would have done otherwise on one or more issues vital to the judgment. *Pharo v. Chambers Cnty.*, 922 S.W.2d 945, 950 (Tex. 1996). "There is no probable injury

when the jury probably would have rendered the same verdict even if the misconduct had not occurred." *Holland*, 352 S.W.3d at 783. If we conclude that there is no injury, we need not determine whether the alleged misconduct was material because the absence of harm is fatal to the inquiry. *Id.*

Before closing arguments, the trial court informed the parties that "one of the jurors had mentioned that another juror had done some research" on Robins the night before. The trial court examined the juror on the record about what he "did and what [he] learned." The juror answered that he did a "Google search," "looked for five minutes and gave up," and did not find anything about Robins. He confirmed that there was "nothing [he] learned outside of the evidence" presented in court and that he could still base his decision "only on the evidence." After the juror testified, the trial court asked the parties whether they had "any other issues with regard to that," and nobody made any objections. Nothing in this exchange or elsewhere in the record shows that the juror's internet research had any influence on the jury or most likely caused him or any other juror to vote differently than they would have voted otherwise on an issue vital to the judgment. *See id.* Consequently, we cannot conclude that Robins satisfied his burden to prove that he was injured by the claimed misconduct because the record does not establish that the verdict would have been different had the misconduct not occurred. *See id.*; *see also Sharpless v. Sim*, 209 S.W.3d 825, 828 (Tex. App.—Dallas 2006, pet. denied) ("Because there is nothing

40

to establish that the verdict would have been any different had the misconduct not occurred, there is no probable injury.”).

We overrule Robins's third issue.

## V. Alleged "Cumulative" Defenses

The statement of issues in Robins's brief includes a fourth issue asserting a "cumulative defense against [the Commission] in light of the various improprieties involved including the 5th Circuit's *McDonald v. Longley*[, 4 F.4th 229 (5th Cir. 2021),] ruling against the Texas Bar in 2021." Although Robins's complaints under *McDonald* are stated as an issue presented, there is no corresponding argument section in the brief. *See* TEX. R. APP. P. 38.1(i). Instead, Robins's references to *McDonald* fall under the section alleging the Commission is liable under TRFRA for religious discrimination. There, Robins offers the *McDonald* case as support for his assertion that "jurisprudence increasingly calls into question the Texas Bar's ability to withstand constitutional scrutiny."

Assuming without deciding that Robins preserved this issue, we fail to see *McDonald*'s relevance or applicability here. In *McDonald*, three Texas lawyers sued the state bar claiming that it was engaged in "political and ideological activities that [were] not germane to its interests in regulating the legal profession and improving the quality of legal services," and therefore, compelling them to join the bar and subsidize those activities violated their First Amendment rights of free speech and

association. *See id.* at 237, 241. The plaintiffs also challenged bar programs that they claimed exceeded the bar's "core regulatory functions." *Id.* at 241. The Fifth Circuit upheld the majority of the challenged bar programs and activities but found certain legislative efforts were not germane to the bar's purposes of regulating the legal profession or improving the quality of legal services available to Texans. *Id.* at 248–52. Therefore, the bar's use of mandatory dues for those efforts violated the plaintiff's speech and association rights. *Id.* at 252. The court also concluded that the bar's procedures were not sufficient to allow members to challenge activities they believe to be nongermane. *Id.* at 253–54.

*McDonald* is distinguishable from this disciplinary action. The Commission's efforts to prosecute violations of the disciplinary rules are not the type of nongermane, "political or ideological" activity that failed constitutional scrutiny in *McDonald*. Rather, the Commission's disciplinary action is germane to the bar's purpose of "regulating the legal profession" and "improving the quality of legal services." *Id.* at 247 (quoting *Keller v. State Bar of Ca.*, 496 U.S. 1, 13 (1990)); *see also* TEX. GOV'T CODE § 81.071 ("Each attorney admitted to practice in this state . . . is subject to the disciplinary and disability jurisdiction of the supreme court and the Commission for Lawyer Discipline, a committee of the state bar."); *Webster*, 704 S.W.3d at 489 (recognizing state bar serves as "an aid to the judicial department's powers under the [Texas] [C]onstitution to regulate the practice of

law" (internal quotation omitted)). *McDonald* thus does not apply, and we overrule Robins's fourth issue.

## VI. Conclusion

We affirm the trial court's judgment. All pending motions are dismissed as moot.[9]

Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

---

[9] On the day this appeal was submitted on the briefs, Robins moved to amend his brief. The Court granted Robins permission to file a five-page supplemental letter brief addressing new authority he identified but otherwise denied his motion. Robins's pending motion for rehearing of that decision is denied. We note Robins obtained six extensions of time to file his appellant's brief and two extensions of time to file a reply brief, which he ultimately did not file.